416 F.2d 980
 LOCAL 189, UNITED PAPERMAKERS AND PAPERWORKERS, AFL-CIO, CLC; United Papermakers and Paperworkers, AFL-CIO, CLC; and Crown Zellerbach Corporation, Appellants,
v.
UNITED STATES of America, by John MITCHELL, Attorney General, et al., Appellees.
 No. 25956.
 United States Court of Appeals Fifth Circuit.
 July 28, 1969.
 Rehearing Denied and Rehearing En Banc Denied October 1, 1969.
 
 COPYRIGHT MATERIAL OMITTED C. Paul Barker, Dodd, Hirsch, Barker & Meunier, New Orleans, La., Warren Woods, Louis F. Oberdorfer, Washington, D. C., Michael J. Molony, Jr., Jerry L. Gardner, New Orleans, La., Betty Southard Murphy, Washington, D. C., for defendant-appellants Local 189, United Papermakers and Paperworkers, AFL-CIO, CLC; United Papermakers and Paperworkers, AFL-CIO, CLC; McInnis, Wilson, Munson & Woods, Washington, D. C., of counsel.
 John W. Vardaman, Jr., Sally Katzen, Washington, D. C., Wilmer, Cutler & Pickering, Washington, D. C., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., of counsel, for appellant Crown Zellerbach Corporation.
 Louis C. La Cour, U. S. Atty., Jerris Leonard, Asst. Atty. Gen., Kenneth L. Johnson, Denis F. Gordon, Attorneys, Department of Justice, Washington, D. C., for the United States.
 David L. Rose, U. S. Department of Justice, Washington, D. C., Richard B. Sobol, Ann Arbor, Mich., George Cooper, New York City., Collins, Douglas & Elie, New Orleans, La., for appellees Local 189a, United Papermakers and Paperworkers, AFL-CIO, CLC, David Johnson, Sr., and Anthony Hill.
 Before WISDOM and DYER, Circuit Judges, and KRENTZMAN, District Judge.
 WISDOM, Circuit Judge:
 
 
 1
 Title VII of the Civil Rights Act of 1964 prohibits discrimination in all aspects of employment.[1] In this case we deal with one of the most perplexing issues troubling the courts under Title VII:[2] how to reconcile equal employment opportunity today with seniority expectations based on yesterday's built-in racial discrimination. May an employer continue to award formerly "white jobs" on the basis of seniority attained in other formerly white jobs, or must the employer consider the employee's experience in formerly "Negro jobs" as an equivalent measure of seniority? We affirm the decision of the district court. We hold that Crown Zellerbach's job seniority system in effect at its Bogalusa Paper Mill prior to February 1, 1968, was unlawful because by carrying forward the effects of former discriminatory practices the system results in present and future discrimination. When a Negro applicant has the qualifications to handle a particular job, the Act requires that Negro seniority be equated with white seniority.
 
 I.
 
 2
 A. The parties stipulated most of the basic facts. Crown Zellerbach (Crown) runs a paper mill at Bogalusa, Louisiana. The Company employs about 950 white workers and 250 Negro workers. Jobs there have always been organized hierarchically within "lines of progression". The jobs within each line for the most part are related functionally so that experience in one job serves as training for the next.
 
 
 3
 Until May 1964, the Company segregated the lines of progression by race, reserving some lines to white employees and others to Negroes. Local 189 of the United Papermakers and Paperworkers, the white local, had jurisdiction over the more desirable lines; Local 189-A, the Negro local, had jurisdiction over the left-overs. With very few exceptions, the lowliest white jobs paid more and carried greater responsibility than the most exalted Negro jobs. Promotion within each line was determined by "job seniority"; when a vacancy occurred, the workers in the slot below it could bid for the job, and the one who had worked the longest in the job slot below had priority.
 
 
 4
 The Company put new employees on "extra boards". These boards were labor pools used to fill temporary vacancies within the lines of progression. The senior men had first call on vacancies in the entry jobs at the bottom of the various lines. When lay-offs occurred, those at the bottom of the line were bumped back to the extra board. They had first claim, however, on any vacancies in their old jobs under "rights of recall". Crown segregated its extra boards, like its lines of progression, by race, one for Negroes and one for whites.
 
 
 5
 The Company merged the extra boards in May 1964. Whoever, regardless of race, had the longest term on the board now gained priority to bid on entry jobs in the white lines. Merger opened up the lines to Negro entrants, and helped the relatively recent Negro employees on the board. It did not help more senior Negroes already in the lines of progression. Moreover, the rights of recall gave any white who had served in a white line preference over others on the board in bidding on his old job. That fact slowed the advance of even newer Negro employees. A "transfer provision" added in 1965 enabled Negroes already in black lines of progression to bid on the bottom jobs in white lines on the basis of their "mill seniority", or time worked at the mill. This change meant that they did not have to become junior men on the extra board in order to bid on the starting job in previously white lines. It also meant that they did not have to surrender certain benefits accruing to mill seniority when they made the transfer.
 
 
 6
 Title VII went into effect with regard to Crown on July 2, 1965. Section 703 (a) (2) makes it unlawful for an employer
 
 
 7
 "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a) (2).
 
 
 8
 Later in 1965 the Equal Employment Opportunity Commission discussed with the Company and the Papermakers the effect of Title VII on seniority arrangements. A letter from Herman Edelsberg, the Executive Director of the EEOC, stated that the Commission would be satisfied by the "non-discriminatory application of the seniority agreement established by collective bargaining," i. e. job seniority, provided that Crown discontinue segregation of the progression lines. The Chairman of the Commission, Franklin D. Roosevelt, Jr., met with representatives of the Company and the unions in December 1965 and declared that "application of the seniority system established by collective bargaining" would comply with the statute.
 
 
 9
 In January 1966 the unions and the Company amended the collective bargaining agreement so as to merge the progression lines within each department on the basis of existing pay rates. Except for one job in the plant, merger by pay rates merely meant tacking the Negro lines to the bottom of white lines. Whites on the extra boards who had rights of recall to jobs formerly entry jobs retained those rights to the same jobs, even though the positions were now in the middle of the merged lines. More importantly, Crown continued to award promotions according to job seniority: the man with the most years in the job slot below the vacancy had first call. Time worked in the mill counted for nothing as such. As a necessary result, Negroes had no seniority in bidding for formerly white jobs except as against each other and new white employees. They could not have such seniority, since the Company had not allowed them into the white progression lines. Crown gave no recognition to years spent in the Negro lines, and continued to make years spent in formerly white jobs the determinative factor in awarding all former white jobs except those previously at the entry level. The system conditioned job advancement upon a qualification that the Company itself had limited racially, regardless of whether the qualification — seniority in previously white jobs — was necessary to do the work. The legality of that arrangement is the main issue here.
 
 
 10
 In February 1967, more than a year after the merger of the lines, the Office of Federal Contract Compliance entered the picture. That agency has responsibility for overseeing compliance with Executive Order 11246 requiring non-discrimination assurances from all employers who contract with the federal government.[3] The OFCC attacked what the EEOC had previously seemed to approve, Crown Zellerbach's system of job seniority. In place of job seniority the OFCC proposed an "A + B" system which would combine an employee's time in the job below the vacancy and his total time at the mill in computing seniority. The Company accepted this compromise and tried to get the Papermakers to go along with it. The two locals, 189 and 189-A, both refused, although for different reasons. Crown thus faced a strike if it went ahead with the "A + B" system and the loss of future federal contracts if it did not.[4] In January it notified the unions that it would install the "A + B" system unilaterally on February 1, 1968. Local 189, the white union, responded by voting to strike on that date. Local 189-A, the Negro union, refused to join in the strike warning, calling the "A + B" system "a step in the right direction".
 
 
 11
 The Government filed this suit on January 30, 1968, to enjoin the strike as an effort "to perpetuate a seniority and recall system which discriminates against Negro employees". The district court granted the injunction the next day. The United States then asked the courts to strike down the "A + B" system as illegal, and to require that mill experience alone become the standard of seniority. The Government now was asking the court to set aside job seniority in any form, a stronger measure than the one requested earlier by the OFCC, which in turn had gone beyond the original position of the EEOC.[5] Local 189-A and two Negro employees intervened as plaintiffs on behalf of all Negro employees at the mill.
 
 
 12
 After a three-day hearing on job seniority, the district court issued an order on March 26, 1968, dealing with two issues that had been stipulated by the parties as severable from the eleven others in the case. The court continued in effect the injunction of January 31. It also held that job seniority "presently discriminate[s] against Negro employees at the mill whenever Negroes hired prior to January 1965 [when progression lines were merged] compete against white employees for promotion, demotion or selection for training". The court also found that job seniority, as a matter of fact, "is not necessitated by safety or efficiency factors * * *." It ordered the abolition of job seniority in favor of mill seniority "in all circumstances in which one or more competing employees is a Negro employee hired prior to January 16, 1966." The decree did not, by its terms, upset the use of job seniority in bidding that involved only whites or Negroes hired after the merger of the lines of progression.
 
 
 13
 In explaining its order, the court pointed out that the abolition of job seniority did not mean that affected Negro employees would be able to bid on any job in the mill solely on the basis of their years with the Company. They would still have to move up the lines of progression job-by-job. Among the competitors within the slot below a vacancy, however, time in the mill rather than time in the job would define seniority. As a further qualification of its order, the court disavowed any intention "to deny Crown the right to require that competing employees have the fundamental qualifications necessary to fill the vacant position."
 
 
 14
 A month after issuing its order, the district court heard testimony and argument on the remaining eleven issues stipulated as severable from the issue of job seniority. The court disposed of one issue by ordering the merger of Local 189 and Local 189-A. The court decided the remaining ten issues on June 26, 1969.[6]
 
 
 15
 B. The stipulated issues are: "whether, under the facts and circumstances of this case, the job seniority system which was in effect at the Bogalusa paper mill prior to February 1, 1968, was unlawful" and, if so, "what is the necessary or appropriate standard or guideline for identifying the seniority of employees for purposes of promotion of demotion?"
 
 
 16
 The plaintiffs maintain that Crown's practice of awarding jobs on the basis of job seniority rather than mill seniority discriminates against Negroes, since they had no way of attaining job seniority in "white" slots until the recent desegregation of the plant. When Negroes bid for jobs above the former entry level of white lines of progression, Crown in effect penalized them for not having what it denied them on account of their race until a short time ago — "white" job seniority. Crown's system gives renewed effect to the old racial distinctions without the plaintiffs say, the justification of business necessity. The practice of awarding jobs by job seniority would, the plaintiffs assert, amount to present and prospective racial discrimination.
 
 
 17
 Crown and Local 189, the white union, maintain that Crown ceased to discriminate in 1966 when it merged the white and Negro lines of progression. That change, coupled with the merger of the extra boards in 1964 and the transfer provisions of 1965 removed all explicit racial classification at the Bogalusa mill. What remains, the defendants say, is a racially neutral system of job seniority. The fact that the system continues to prefer whites over previously hired Negroes in filling certain vacancies does not in itself show racial discrimination. That effect, the defendants argue, is merely an ineradicable consequence of extinct racial discrimination. They point to evidence that Congress meant Title VII to apply prospectively only. Competitive seniority has an honorable place in the history of labor,[7] and portions of the legislative history of the Act seem to immunize accrued rights of seniority against remedial measures. Thus Title VII § 703(h) specifically protects "bona fide seniority systems" from the operation of the Act. The defendants also maintain that insistence upon mill seniority would effectively bestow preferential treatment upon one race, which the Act by its terms positively forbids.
 
 I.
 
 18
 No one can quarrel with the broad proposition that Title VII operates only prospectively. By specific provision, the Act did not become effective at all until one year after the date of enactment. The central operative provision, § 703(a), declares that "it shall be an unlawful employment practice" for an employer to discriminate. (Emphasis added.) Section 701(b) and (e) provide that for staggered effective dates: The Act applied on July 2, 1965, only to employers of 100 employees or more, extending to employers of 75, 50, and 25 at successive yearly intervals. The dispute is whether a seniority system based on pre-Act work credit constitutes present discrimination.
 
 
 19
 Although the effect of Title VII provoked considerable debate in Congress, the legislative history of the title is singularly uninstructive on seniority rights. Opponents of the Act warned that Title VII would destroy hard-earned seniority rights; proponents responded that it would not affect accrued seniority.[8] In Quarles v. Philip Morris, Inc., E.D.Va. 1968, 279 F.Supp. 505, after a careful review of the legislative history, Judge John D. Butzner, Jr. concluded:
 
 
 20
 Several facts are evident from the legislative history. First, it contains no express statement about departmental seniority. Nearly all of the references are clearly to employment seniority. None of the excerpts upon which the company and the union rely suggests that as a result of past discrimination a Negro is to have employment opportunities inferior to those of a white person who has less employment seniority. Second, the legislative history indicates that a discriminatory seniority system established before the act cannot be held lawful under the act. The history leads the court to conclude that Congress did not intend to require "reverse discrimination"; that is, the act does not require that Negroes be preferred over white employees who possess employment seniority. It is also apparent that Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the act.
 
 
 21
 Perhaps the strongest argument for the Quarles construction of the Act is § 703(h):
 
 
 22
 Section 703(h) expressly states the seniority system must be bona fide. The purpose of the act is to eliminate racial discrimination in covered employment. Obviously one characteristic of a bona fide seniority system must be lack of discrimination. Nothing in § 703(h), or in its legislative history suggests that a racially discriminatory seniority system established before the act is a bona fide seniority system under the act. Quarles v. Philip Morris, Incorporated, E.D.Va. 1968, 279 F.Supp. 505, 517.
 
 
 23
 We agree with this view.
 
 II.
 
 24
 The defendants assert, paradoxically, that even though the system conditions future employment opportunities upon a previously determined racial status the system is itself racially neutral and not in violation of Title VII. The translation of racial status to job-seniority status cannot obscure the hard, cold fact that Negroes at Crown's mill will lose promotions which, but for their race, they would surely have won. Every time a Negro worker hired under the old segregated system bids against a white worker in his job slot, the old racial classification reasserts itself, and the Negro suffers anew for his employer's previous bias. It is not decisive therefore that a seniority system may appear to be neutral on its face if the inevitable effect of tying the system to the past is to cut into the employees present right not to be discriminated against on the ground of race. The crux of the problem is how far the employer must go to undo the effects of past discrimination. A complete purge of the "but-for" effects of previous bias would require that Negroes displace white incumbents who hold jobs that, but for discrimination, the Negroes' greater mill seniority would entitle them to hold. Under this "freedom now" theory,[9] allowing junior whites to continue in their jobs constitutes and act of discrimination.
 
 
 25
 Crown and Local 189 advance a "status quo" theory: the employer may satisfy the requirements of the Act merely by ending explicit racial discrimination.[10] Under that theory, whatever unfortunate effects there might be in future bidding by Negroes luckless enough to have been hired before desegregation would be considered merely as an incident of now extinguished discrimination.
 
 
 26
 A "rightful place" theory[11] stands between a complete purge of "but-for" effects maintenance of the status quo. The Act should be construed to prohibit the future awarding of vacant jobs on the basis of a seniority system that "locks in" prior racial classification. White incumbent workers should not be bumped out of their present positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation.
 
 
 27
 Not all "but-for" consequences of pre-Act racial classification warrant relief under Title VII. For example, unquestionably Negroes, as a class, educated at all-Negro schools in certain communities have been denied skills available to their white contemporaries. That fact would not, however, prevent employers from requiring that applicants for secretarial positions know how to type, even though this requirement might prevent Negroes from becoming secretaries.
 
 
 28
 This Court recently struck down a nepotism membership requirement of a "white" union which shortly before had ceased overt discrimination. Local 53 of the International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 5 Cir. 1969, 407 F.2d 1047. Under the nepotism rule, only the sons of members or close relatives living with members could become "improvers", and only "improvers" could be accepted into the union. Relationship to a member as a prerequisite to admission had the necessary effect of locking non-whites out of the union. The union argued that the desire to provide family security was a rational non-racial basis for the rule and that since the nepotism requirement excluded all persons unrelated to members, regardless of their race, it could not, therefore, be called a racial classification. This court held that the rule served no purpose related to ability to perform the work in the asbestos trade and that it violated Title VII:
 
 
 29
 The District Court did no more than prevent future discrimination when it prohibited a continuing exclusion of Negroes through the application of an apparently neutral membership provision which was originally instituted at least in part because of racial discrimination and which served no significant trade-related purpose. While the nepotism requirement is applicable to black and white alike and is not on its face discriminatory, in a completely white union the present effect of its continued application is to forever deny to negroes and Mexican-Americans any real opportunity for membership.
 
 
 30
 In Vogler this Court made the point, citing Quarles, that "where necessary to insure compliance with the Act, the District Court was fully empowered to eliminate the present effects of past discrimination". Vogler, however, does not mesh completely with the facts in this case. The nepotism rule there, as the court pointed out, had scant relation to the operation of the business. It also had the inevitable effect of assuring the lily-white status of the union for all time. Nevertheless, the decision does support the position that reliance on a standard, neutral on its face, is no defense under the Act when the effect of the standard is to lock the victims of racial prejudice into an inferior position.
 
 
 31
 The controllng difference between the hypothetical typing requirement and the nepotism rule rejected in Vogler is business necessity. When an employer or union has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, those policies must yield, unless there is an overriding legitimate, non-racial business purpose. Secretaries must be able to type. There is no way around that necessity. A nepotism rule, on the other hand, while not unrelated to the training of craftsmen,[12] is not essential to that end. To be sure, skilled workers may gain substantial benefits from having grown up in the home of a member of the trade. It is clear, nonetheless, that the benefits secured by nepotism must give way because of its effective continuation and renewal of racial exclusion. That much was decided in Vogler.
 
 
 32
 The decisive question then is whether the job seniority standard, as it is now functioning at the Bogalusa plant, is so necessary to Crown Zellerbach's operations as to justify locking Negroes, hired before 1966, into permanent inferiority in their terms and conditions of employment. The record supports the district court's holding that job seniority is not essential to the safe and efficient operation of Crown's mill. The defendants' chief expert witness, Dr. Northrup, made it clear that he considered mill seniority "disastrous" only to the extent that it allowed all men in a slot to bid on the basis of their time at the mill. He stated that mill seniority in that sense would create labor unrest because its main effect would be to allow whites to "jump" other whites and Negroes to "jump" other Negroes. He also expressed fears about allowing anyone to bid on any vacancy in a line of progression, without requiring that he first advance job-by-job through the various levels below it. That problem might be solved, he stated, by imposing a residency requirement for training purposes. Dr. Northrup explicity stated that job seniority does not provide the only safe or efficient system for governing promotions. He suggested, in fact, an alternative "job credit" system that would give certain fractional seniority credit to victims of discrimination for the years in which they had been excluded from the white progression lines.
 
 
 33
 The court took account of Dr. Northrup's apprehensions in fashioning its decree. In place of job security the court ordered the institution of a mill seniority system carefully tailored to assure that no employee would have a right to a job that he could not perform properly. The court's decision put the emphasis where it belongs: absent a showing that the worker has the ability to handle a particular job, the entry job is the proper beginning for any worker. Under the court's decree, employees still must move up through the various lines of progression job-by-job.[13] As a further restraint, if a certain minimum time is needed in one job to train an employee for the next, a residency requirement may be imposed that will slow the rise of Negro employees. Under the system that is in effect at the mill now, and that is unaffected by the decree, that residency period is six months. To meet the problem of labor unrest that might result from "jumping" unrelated to racial issues, the court specifically limited its decree to instances in which Negroes hired before 1966 were among the bidders. Finally, and most importantly, both the court's decree and the existing collective bargaining agreement give Crown Zellerbach the right to deny promotions to employees who lack the ability or qualification to do the job properly.
 
 
 34
 All these precautions, we think, bear out the plaintiffs' assertion that there are satisfactory alternatives to job seniority at the Bogalusa mill. They lead us to conclude that the imposition of a system that perpetuates and renews the effects of racial discrimination in the guise of job seniority is not necessary or justified at Bogalusa. Job seniority, embodying as it does, the racially determined effects of a biased past, constitutes a form of present racial discrimination.
 
 
 35
 This case is not the first case to present to courts in this circuit the problem of dealing with a change in system that is apparently fair on its face but in fact freezes into the system advantages to whites and disadvantages to Negroes. In United States v. State of Louisiana, E.D.La. 1963, 225 F.Supp. 353, a three-judge court had before it a new citizenship test adopted by the State Board of [Voters] Registration. The test was fair on its face and, perhaps, capable of fair administration. But it was a test that white voters, almost all of whom were registered, had not had to take. It was a difficult test for eligible Negroes, most of whom were not registered. The court enjoined the State from administering the test. "The promise of evenhanded justice in the future does not bind our hands in undoing past injustices". 225 F.Supp. at 396. The court said:
 
 
 36
 The cessation of prior discriminatory practices cannot justify the imposition of new and onerous requirements, theoretically applicable to all, but practically affecting primarily those who bore the brunt of previous discrimination. An appropriate remedy therefore should undo the results of past discrimination as well as prevent future inequality of treatment. A court of equity is not powerless to eradicate the effects of former discrimination. If it were, the State could seal into permanent existence the injustices of the past.
 
 
 37
 The Supreme Court affirmed, adding: "the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709. See also Meredith v. Fair, 5 Cir. 1962, 298 F.2d 696, 702, cert. denied; United States v. Dogan, 5 Cir. 1963, 314 F.2d 767; United States v. Atkins, 5 Cir. 1963, 323 F.2d 733; United States v. Penton, M.D.Ala. 1962, 212 F.Supp. 193. Cf. Guinn v. United States, 1915, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340; Lane v. Wilson, 1939, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Goss v. Board of Education, 1963, 373 U.S. 683, 688, 83 S.Ct. 1405, 1409, 10 L.Ed.2d 632, 636.
 
 
 38
 It might be said that in these cases the courts focussed on the unlawfulness of the prior discrimination. In Gaston County v. United States, 1969, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309, however, the Court's refusal to approve a voter literacy test was based on the inferior education inherent in segregated schooling. The automatic "triggering" provisions of the 1965 Voting Rights Act of 1965 had suspended Gaston County's literacy test because certain indicia chosen by Congress raised the presumption that the tests were being used to discriminate against Negroes seeking to register. In order to reinstate its test under the Act, Gaston County had to show that it had not used the test in the preceding five years "for the purpose or with the effect of denying or abridging the right to vote on account of race or color." The district court found, as a fact, that Gaston County's Negro schools had not provided educational opportunities equal to those available to whites. That alone, said the Supreme Court, would make the imposition of a literacy test an act of continuing discrimination. Neither the fair administration of the test, nor its legitimate public purpose could save it from condemnation under the Act.
 
 III.
 
 39
 With specific regard to employment opportunities under Title VII, decisions by at least two district courts support our conclusion that facially neutral but needlessly restrictive tests may not be imposed where they perpetuate the effects of previous racial discrimination.
 
 
 40
 In Quarles v. Philip Morris, Inc., E.D. Va. 1968, 279 F.Supp. 505, the first case to challenge the legality of a promotion system under Title VII, the employer had segregated the races by departments at its plant. The employer desegregated the plant but prohibited transfers from one department to another. It also required that the transferor bid on vacancies according to his departmental seniority, rather than his seniority at the plant. The effect was to deny to Negroes promotion into the better paying jobs, because they could not accumulate seniority in the fabrication and warehouse departments, where the better jobs lay. Quarles, a Negro employed in the prefabrication department, could not become a truck driver, a higher-rung position in an all-white department. The court held that the new arrangement violates the statute (279 F. Supp. at 513, 519):
 
 
 41
 "The present discrimination resulting from historically segregated departments is apparent from consideration of the situation of a Negro who has worked for ten years in the prefabrication department. * * * [He is required] to sacrifice his employment seniority and take new departmental seniority based on his transfer date. Thus a Negro with ten years employment seniority transferring * * * from the prefabrication department to the fabrication department takes an entry level position with departmental seniority lower than a white employee with years less employment seniority. These restrictions upon the present opportunity for Negroes result from the racial pattern of the company's employment practices prior to January 1, 1966. The restrictions do not result from lack of merit or qualification. A transferee under any plan must satisfy ability and merit requirements regardless of his seniority.
 
 * * * * * *
 
 42
 The court finds that the defendants have intentionally engaged in unlawful employment practices by discriminating on the ground of race against Quarles, and other Negroes similarly situated. This discrimination, embedded in seniority and transfer provisions of collective bargaining agreements, adversely affects the conditions of employment and opportunities for advancement of the class."
 
 
 43
 In Dobbins v. Local 212, IBEW, S.D.Ohio 1968, 292 F.Supp. 413, the union had formerly excluded nonwhites from membership. The effects of this practice had been doubly serious, since the union controlled hiring referrals within a certain geographic area. After opening its apprenticeship programs and membership to Negroes the union continued to prefer applicants who had previously worked under union contracts. This preferential referral system contained no explicit racial classification or discriminatory purpose. The court looked, nonetheless, to its inevitable discriminatory effect:
 
 
 44
 "A policy of giving priority in work referral to persons who have experience under the Local's Collective Bargaining Agreement is discriminatory when competent N[egroe]s have previously been denied the opportunity to work under the referral agreement by reason of their race." 292 F.Supp. at 445.
 
 
 45
 When the defendant's conduct evidences an "economic purpose" there is no discrimination under Title VII: "The limitation of either union or apprentice membership to a number far below the number necessary for the particular trade would be a discriminatory practice and pattern in a context involving an all W[hite] union membership with a previous history of discrimination. Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). However, on a showing by a defendant that the limitation has nothing to do with any discriminatory intention but is related to reasonable economic purpose, the limitation in number is not unlawful." The court went on to hold the referral system illegal:
 
 
 46
 "Preference to union members in work referral is a violation of Title VII if that preference operates, after July, 1965, to continue to restrict the employment opportunities of N's who have been excluded from membership and work under union auspices because of their race. United States by Clark v. Local 189, United Papermakers and Paperworkers, 282 F.Supp. 39 (D.C. La., 1968); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (D.C.Va., 1968)." 292 F.Supp. at 446.
 
 
 47
 Nothing that we said in Whitfield v. United Steelworkers, Local 2708, 5 Cir. 1958, 263 F.2d 546, cert. denied 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254, compels a different result. In that case Negro workers challenged a plan, negotiated through collective bargaining, purporting to do away with segregated lines of progression in a steel mill. There was no issue in Whitfield as to the measure of promotion from one job to another. Quarles distinguishes Whitfield (279 F. Supp. at 518):
 
 
 48
 Whitfield does not stand for the proposition that present discrimination can be justified simply because it was caused by conditions in the past. Present discrimination was allowed in Whitfield only because it was rooted in the Negro employees' lack of ability and training to take skilled jobs on the same basis as white employees. The fact that white employees received their skill and training in a discriminatory progression line denied to the Negroes did not outweigh the fact that the Negroes were unskilled and untrained. Business necessity, not racial discrimination, dictated the limited transfer privileges under the contract.
 
 
 49
 In Whitfield the company had organized functionally-related jobs into two separate lines of progression, Line 1 (the skilled jobs) for whites and Line 2 (the unskilled jobs) for Negroes. Advancement in a line was based on knowledge and experience acquired in the next lower job. The company opened both lines on a non-racial basis, and added that Negroes in Line 2 would in the future have preference over new whites in applying for vacancies in Line 1. Except for variations in pay, the change had the effect of merging the lines into one, with the formerly white line on top. In Whitfield, unlike the present case, the two lines were not so functionally related that experience at the top of the formerly black line could provide adequate training for the bottom jobs in the white line. The company therefore required that men moving into the formerly all-white Line 1 take a qualification test, one that the white incumbents had not been required to take. (The company had previously required 260 hours "probationary" experience instead.) Negroes objected to the test requirement on the ground that whites already working in Line 1 did not have to take the test to advance or remain in the line. The company also required, as we have said, that employees bidding into Line 1 from Line 2 start at the bottom job. Negroes in Line 2 protested that this requirement also discriminated against them because it meant that Negroes would have to take a wage cut in moving from the top job in Line 2 to the bottom job in Line 1. The plaintiffs brought the complaint under the Steele doctrine,[14] which requires certified unions to represent members of the bargaining unit on a non-discriminatory basis.
 
 
 50
 This Court rejected both of the plaintiffs' objections. We held that the qualification test was the "`minimum assurance' the Company could have of efficient operations", and that the company and union had gone "about as far as they could go in giving negroes a preference in filling Number 1 line vacancies, consistent with being fair to incumbents and consistent with efficient management." 263 F.2d at 550 (emphasis added.) The requirement that entrants into Line 1 start at the bottom job was justified as a business necessity:
 
 
 51
 Such a system was conceived out of business necessity, not out of racial discrimination. An employee without proper training and with no proof of potential ability to rise higher, cannot expect to start in the middle of the ladder, regardless of plant seniority. It would be unfair to the skilled, experienced, and deserving employee to give a top or middle job to an unqualified employee. It would also destroy the whole system of lines of progression, to the detriment of efficient management and to the disadvantage of negro as well as white employees having a stake in orderly promotion." 263 F.2d at 550.
 
 
 52
 In United States by Clark v. H. K. Porter Co., N.D.Ala.1968, 296 F.Supp. 40, 90, the court rejected an attack by the Government upon "the procedure that the first man to [get] a job is the first to advance", i. e. job seniority, super-imposed, as here, upon a history of racial discrimination. The court found, as a matter of fact, that it was not "permissible" to assume "on the record in this case" that
 
 
 53
 "with less than the amount of on-the-job training now acquired by reason of the progression procedure, employees could move into the jobs in the progression lines and perform those jobs satisfactorily and — more importantly — without danger of physical injury to themselves and their fellow employees." 296 F.Supp. at 91.
 
 
 54
 In other words, the record in that case, as the district court viewed it, showed that safety and efficiency, the component factors of business necessity, would not allow relaxation of the job seniority system. We see no necessary conflict between Porter's holding on this point and our holding in the present case.
 
 
 55
 We have also considered two district court decisions cited by the defendants, United States v. Sheet Metal Workers, E.D.Mo.1968, 280 F.Supp. 719, and Griggs v. Duke Power Co., M.D.N.C.1968, 292 F.2d 243. In Sheet Metal Workers, the defendant white unions had adopted a referral system giving priority to men with previous referrals. They had also discriminated racially before the effective date of the Act as had the union in Dobbins. On the other hand, they had adopted positive measures to encourage minority-group membership. The district court could find no person who had actually suffered on account of his race under the referral preference system and no "pattern or practice" of discrimination. (The sole plaintiff was the United States.) On the contrary, it found that "in every instance, qualified Negroes applying for union membership and/or apprenticeship training since July 2, 1965, have been admitted therein." 280 F.Supp. 729. Among union members, of course, the referral preference system might well have had the effect of favoring whites, since they would have had a greater chance to amass time under the collective bargaining agreement. On the other hand, if there was more than enough work to go around, the discriminatory tendence inherent in the referral rule might not have asserted itself. The opinion is silent on that critical fact, noting only that "the record is devoid of any specific instance of discrimination". 280 F.Supp. 730.
 
 
 56
 In Griggs the defendant employer had in the past limited Negroes to jobs in the labor department, excluding them from better work in other departments. The plaintiffs sought to overturn a requirement of ten years standing that any employee transferring into one of the formerly white departments have a high school education or passing marks on a qualification test. The court found that both the tests and the education requirements were not racially motivated, but were part of the company's effort to upgrade its work force. It took note of a specific provision in Title VII, § 703(h), that exempts from the operation of the Act the use of "any professionally developed ability test * * * not designed * * * to discriminate because of race" and went on to strike down an EEOC interpretation of that provision which would limit the exemption to tests that measure ability "required by the particular job or class of jobs which the applicant seeks". (Emphasis added.) The court concluded that the defendant had not violated the Act, since it had not discriminated after July 2, 1965.
 
 
 57
 When an employer adopts a system that necessarily carries forward the incidents of discrimination into the present, his practice constitutes on-going discrimination, unless the incidents are limited to those that safety and efficiency require. That appears to be the premise for the Commission's interpretation of § 703(h). To the extent that Griggs departs from that view, we find it unpersuasive.
 
 IV.
 
 58
 The defendants maintain that Congress specifically exempts seniority systems such as Crown's from the operation of Title VII. In support of their assertion the defendants cite that portion of § 703(h) which allows an employer to "apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system * * * provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin".
 
 
 59
 No doubt, Congress, to prevent "reverse discrimination" meant to protect certain seniority rights that could not have existed but for previous racial discrimination. For example a Negro who had been rejected by an employer on racial grounds before passage of the Act could not, after being hired, claim to outrank whites who had been hired before him but after his original rejection, even though the Negro might have had senior status but for the past discrimination. As the court pointed out in Quarles, the treatment of "job" or "department seniority" raises problems different from those discussed in the Senate debates: "a department seniority system that has its genesis in racial discrimination is not a bona fide seniority system." 279 F.Supp. at 517.
 
 
 60
 It is one thing for legislation to require the creation of fictional seniority for newly hired Negroes, and quite another thing for it to require that time actually worked in Negro jobs be given equal status with time worked in white jobs. To begin with, requiring employers to correct their pre-Act discrimination by creating fictional seniority for new Negro employees would not necessarily aid the actual victims of the previous discrimination. There would be no guaranty that the new employees had actually suffered exclusion at the hands of the employer in the past, or, if they had, there would be no way of knowing whether, after being hired, they would have continued to work for the same employer. In other words, creating fictional employment time for newly-hired Negroes would comprise preferential rather than remedial treatment. The clear thrust of the Senate debate is directed against such preferential treatment on the basis of race. That sentiment was codified in an important portion of Title VII, § 703(j):
 
 
 61
 "(j) Nothing contained in this sub-chapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area." 42 U.S.C. § 2000e-2(j).
 
 
 62
 No stigma of preference attaches to recognition of time actually worked in Negro jobs as the equal of white time. The individual victims of prior discrimination in this case would necessarily be the ones — the only ones — to benefit by the institution of mill seniority, as modified in the decree. We conclude, in agreement with Quarles, that Congress exempted from the anti-discrimination requirements only those seniority rights that gave white workers preference over junior Negroes. This is not to say that Whitfield and Quarles and Title VII prohibit an employer from giving compensatory training and help to the Negro workers who have been discriminated against. Title VII's imposition of an affirmative duty on employers to undo past discrimination permits compensatory action for those who have suffered from prior discrimination.
 
 V.
 
 63
 We find unpersuasive the argument that, whatever its operational effects, job seniority is immune under the statute because not imposed with the intent to discriminate. Section 703(h), quoted earlier, excludes from the strictures of Title VII different working terms dictated by "bona fide" seniority systems "provided that such differences are not the result of an intention to discriminate because of race * * *."[15] Here, however, if Crown did not intend to punish Negroes as such by reinstituting job seniority, the differences between the job status of Negroes hired before 1966 and whites hired at the same time would have to be called the "result" of Crown's earlier, intentional discrimination. Quarles put it this way:
 
 
 64
 "The differences between the terms and conditions of employment for white [sic] and Negroes about which plaintiffs complain are the result of an intention to discriminate in hiring policies on the basis of race before January 1, 1966. The differences that originated before the act are maintained now. The act does not condone present differences that are the result of intention to discriminate before the effective date of the act, although such a provision could have been included in the act had Congress so intended. The court holds that the present differences in departmental seniority of Negroes and white [sic] that result from the company's intentional, racially discriminatory hiring policy before January 1, 1966 are not validated by the proviso of § 703(h)" 279 F.Supp. 517-518.
 
 
 65
 Section 706(g) limits injunctive (as opposed to declaratory) relief to cases in which the employer or union has "intentionally engaged in" an unlawful employment practice. Again, the statute, read literally, requires only that the defendant meant to do what he did, that is, his employment practice was not accidental. The relevant legislative history, quoted in the margin, bears out the language of the statute on that point.
 
 
 66
 Section 707(a) allows the Attorney General to enforce the Act only where there is a "pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter" and where the pattern or practice "is intended to deny the full exercise of the rights herein described". Defendants contend that no such condition existed here. The same point arose in Dobbins. The court rejected it (292 F.Supp. at 448):
 
 
 67
 "In reviewing statutes, rules or conduct which result in the effective denial of equal rights to Negroes or other minority groups, intention can be inferred from the operation and effect of the statute or rule or from the conduct itself. The conduct of defendant in the present case `by its very nature' contains the implications of the required intent. Local 357, Intern. Broth. of Teamsters, etc. v. National Labor Relations Board, 365 U.S. 667 at 675, 81 S.Ct. 835, 6 L.Ed. 2d 11 (1961) citing Radio Officers' Union, etc. v. National Labor Relations Board, 347 U.S. 17, 45, 74 S.Ct. 323, 98 L.Ed. 455 (1954). See also the remarks of then Senator Humphrey, 110 Cong.Rec. 14270 in reference to Title VII, `Intention could, be proved by or inferred from words, conduct or both.' Thus the Attorney General has a cause of action when the conduct of a labor organization in relation to N's or other minority groups has the effect of creating and preserving employment opportunities for W's only. Section 707(a) of the Civil Rights Act of 1964."
 
 
 68
 Here, as in Dobbins, the conduct engaged in had racially-determined effects. The requisite intent may be inferred from the fact that the defendants persisted in the conduct after its racial implications had become known to them. Section 707(a) demands no more.
 
 VI.
 
 69
 The defendants contend that the letters and statements made by EEOC officials approving the merger of Crown's progression lines acted as a bar under § 713(b) of the Act to suit by either the Government or by the private plaintiffs Johnson, Hill, and Local 189-A. The relevant portion of § 713(b) reads as follows: "In any action or proceeding based on any alleged unlawful employment practice, no person shall be subject to any liability or punishment for or on account of (1) the commission by such person of an unlawful employment practice if he pleads and proves that the act or omission complained of was in good faith, in conformity with, and in reliance on any written interpretation or opinion of the Commission".
 
 
 70
 The key phrase in this provision is "written opinion or interpretation of the Commission". The EEOC published its own interpretation of the phrase in the Federal Register in June 1965, before Title VII took effect and some six months before the public statements at issue here: "Only (a) a letter entitled `opinion letter' and signed by the General Counsel on behalf of the Commission or (b) matter published and so designated in the Federal Register may be considered a `written interpretation or opinion of the Commission' within the meaning of section 713 of Title VII." 29 C.F.R. § 1601.30.
 
 
 71
 The statements that Crown relied upon to its supposed detriment in this case do not fall within either of the defined categories. They appeared neither as portions of the Federal Register or as designated "opinion letters" over the signature of the General Counsel. We have merely a letter from Mr. Edelsberg, Executive Director, and a statement of Mr. Roosevelt, the Chairman of the Commission. Mr. Edelsberg was not General Counsel, nor did his letter bear the "opinion letter" label. Mr. Roosevelt issued his statement orally. The regulation clearly requires more.
 
 
 72
 Courts give great weight to an agency's interpretation of the statute that it administers.[16] The regulation here gives reasonable scope to the statutory provision. A broader reading might bind the Commission to informal or unapproved opinions volunteered by members of its staff.
 
 
 73
 We cannot help sharing Crown Zellerbach's bewilderment at the twists and turns indulged in by government agencies in this case. We feel compelled to hold, however, that neither the statement by Chairman Roosevelt nor the letter by Executor Director Edelsberg provides a legal defense to the present suit.
 
 VII.
 
 74
 Our main conclusions may be summarized as follows: (1) Crown's job seniority system carries forward the discriminatory effects integral to the company's former employment practices. (2) The safe and efficient operation of the Bogalusa mill does not depend upon maintenance of the job seniority system. (3) To the extent that Crown and the white union insisted upon carrying forward exclusion of a racially-determined class, without business necessity, they committed, with the requisite intent, in the statutory sense, an unfair employment practice as defined by Title VII.
 
 
 75
 The district court thoughtfully worked a decree studded with provisos to protect the employer from the imposition of unsafe or inefficient practices and at the same time prevent racial discrimination. The decree also specifically provides that job seniority may still apply to bidding between one white employee and other. By making the decree applicable only to bidding that involves Negroes hired before 1966, the district court limited the remedy to the scope of the illegal conduct. The judgment of the district court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Pub.L. No. 88-352, 78 Stat. 241, 42 U.S.C. §§ 2000e to 2000e-15. For the legislative history, see Bureau of National Affairs, The Civil Rights Act of 1964; Vass, Title VII: Legislative History, 7 B.C.Ind. & Com.L.Rev. 431 (1966). Section 703(a) provides that:
 "It shall be an unlawful employment practice for an employer —
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or
 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."
 
 
 [2]
 In the last two or three years there has been a burst of writing on Title VII and seniority rights. See, for example, Gould, Seniority and the Black Worker: Reflections onQuarles and its Implications 47 Tex.L.Rev. 1039 (1969); Cooper & Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598 (1969) (The authors are of counsel in the case before the court and in some of the other cases mentioned in this opinion); Jenkins, A Study of Federal Effort to End Job Bias: A History, A Status Report and a Prognosis, 14 How.L.J. 259 (1968); Gould, Employment Security, Seniority and Race: The Role of Title VII of the Civil Rights Act of 1964, 13 How.L.J. 1 (1967); Walker, Title VII: Complaint and Enforcement Procedures and Relief and Remedies, 7 B.C.Ind. & Com.L.Rev. 495, 518 (1966); Vaas, Title VII: Legislative History, 7 B.C.Ind. & Com.L. Rev. 431 (1966); Note, Civil Rights-Racially Discriminatory Employment Practices under Title VII, 46 N.C.L.Rev. 891 (1968) (The note is on Quarles); Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260 (1967) (The court in Quarles v. Philip Morris, Inc., D.C., 279 F.Supp. 505, heavily relied on this note. In this case we draw heavily on Quarles and the note.)
 
 
 [3]
 Section 202 of the order in part reads as follows:
 "* * * During the performance of this contract, the contractor agrees as follows: `(1) The contractor will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause." (3 C.F.R.1965 Supp. p. 168.)
 
 
 [4]
 Crown obtained an injunction from a district court in December restraining the Secretary of Labor from barring the company from federal contracts without a prior hearing. Crown Zellerbach Corp. v. Wirtz, D.D.C.1968, 281 F.Supp. 337
 
 
 [5]
 See Section VI of this opinion
 
 
 [6]
 On June 26, 1969 the district court issued its findings of fact and conclusions of law on the remaining issues. (1) The court found that Crown had continued to discriminate in job assignments by appointing whites to traditionally white jobs and Negroes to traditionally Negro jobs. The court added to the aggrieved class Negroes hired since the merger of the progression lines (1966), except for the six Negroes hired since then "who in fact bid for and received formerly white jobs from the Extra Board". (2) The court concluded that a six-months residency requirement was not necessary to train employees for the next higher job in every instance. The parties, it noted, had stipulated which residency requirements were justified by need. (3) The court also found that certain jobs provide no training for the next higher levels. It therefore held that Negroes within the aggrieved class could skip those jobs in bidding on higher jobs in the merged lines of progression. (4) Finally, the court found that 64 hours of temporary assignment to a job per month provided training equivalent to permanent assignment to the job and should be treated as such for the purposes of bidding. The disposition of these and other issues in the district court's decision of June 26 does not affect our consideration of its earlier findings of fact and conclusions of law
 
 
 [7]
 Cooper and Sobol, 82 Harv.L.Rev. 1601, fn. 2: "The use of competitive status seniority to govern promotions, demotions, and layoffs is a fundamental aspect of industrial relations in this country. In nearly all businesses of significant size whose employees are organized, a seniority system plays some role in determining the allocation of the work. Such systems are commonly accompanied by lines of progression or promotional ladders which establish an order of jobs through which employees normally are promoted
 Seniority may be measured by total length of employment with the employer ("employment," "mill," or "plant" seniority), length of service in a department, ("departmental seniority"), length of service in a line of progression ("progression line" seniority), or length of service in a job ("job" seniority). Different measures of seniority sometimes are used in the same plant for different purposes. The variations and combinations of seniority principles are very great, but in all cases the basic measure is length of service, with preference accorded to the senior worker. Similarly, construction craft unions, which control the allocation of local work in their craft, have adopted referral rules based on length of service."
 
 
 [8]
 "Title VII would have no effect on seniority rights existing at the time it takes effect" Justice Department statement. Cong.Record, April 8, 1964, p. 6986. "If a rule were to state that all Negroes must be laid off before any white man, such a rule could not serve as a basis for a discharge subsequent to the effective date of the title * * * but, in the ordinary case, assuming that seniority rights were built up over a period of time during which Negroes were not hired, these rights would not be set aside by taking effect of Title VII. Employer and labor organizations would simply be under a duty not to discriminate against Negroes because of their race. Any differences in treatment based on established seniority rights would not be based on race and would not be forbidden by the title." Ibid. "Title VII would have no effect on established seniority rights. Its effect is prospective and not retrospective. Thus, for example, if a business has been discriminating in the past and as a result has an all-white working force, when the Title comes into effect, the employer's obligation would be simply to fill future vacancies on a non-discriminatory basis. He would not be obliged — or indeed, permitted — to fire whites in order to hire Negroes, or to prefer Negroes for future vacancies, or, once Negroes are hired, to give them special seniority rights at the expense of the white workers hired earlier." Memorandum by Senators Clark and Case. Bureau of National Affairs Operations Manual, The Civil Rights Act of 1964, p. 320. See Cooper and Sobol, fn. 2, 82 Harv.L.Rev. 1607-1609
 
 
 [9]
 See Note, 80 Harv.L.Rev., 1268 fn. 2
 
 
 [10]
 Id
 
 
 [11]
 Id
 
 
 [12]
 See Kotch v. Board of River Port Pilot Commrs., 1947, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093
 
 
 [13]
 See footnote 6
 
 
 [14]
 See Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, and Syres v. Oil Workers International Union, Local 23, 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785
 
 
 [15]
 "In determining the meaning of `intentional,' resort must be had almost entirely to legislative history. In its original form, 706(g) contained no such requirement; it was amended by Senator Dirksen's proposal, probably in response to opposition pressure. The first draft of the amendment contained the word `willfully' instead of `intentionally'; interpretative material was introduced into the record by Senator Dirksen:
 The words `willful and willfully' as ordinarily employed, mean nothing more than that the person, of whose actions or default the expressions are used, knows what he is doing, intends what he is doing, and is a free agent. * * *
 The terms are also employed to denote an intentional act * * * as distinguished from an accidental act * * *
 This is precisely the situation which might exist if the words are not added. * * * Accidental, inadvertent, heedless, unintended acts could subject an employer to charges under the present language.
 For reasons that are not apparent, this version was not enacted, and not until some time later was the amendment with the present language passed. The only significant difference between the two versions is the substitution of `intentionally' for `willfully' and there is no indication that any strengthening of the requirement was meant. It may be concluded that the Dirksen Amendment does not greatly narrow the coverage of section 706(g)." Note, Legal Implications of the Use of Standardized Ability Tests in Employment and Education, 68 Col.L.Rev. 691, 713 (1968).
 
 
 [16]
 Zemel v. Rusk, 1965, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179; Udall v. Tallman, 1965, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616; Power Reactor Development Corp. v. Int. U. of Elec., 1960, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924
 
 
 
 76
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 77
 The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.