**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**HAYES INTERNATIONAL CORPORA-**
**TION et al., Defendants-Appellees.**

No. 71–1392.

United States Court of Appeals,
Fifth Circuit.

Feb. 22, 1972.

Wayman G. Sherrer, U. S. Atty., Birmingham, Ala., Robert T. Moore, David W. Allen, David L. Rose, Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Drayton Nabers Jr., Joseph F. Johnston, Birmingham, Ala., John A. Fillion, Associate Gen. Counsel, Solidarity House, Detroit, Mich., Bernard G. Link, Baltimore, Md., for defendants-appellees.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

DYER, Circuit Judge:

In this employment discrimination case the district court found that a transfer plan instituted by Hayes in 1968 gave incumbent Negro employees all the relief they were entitled to under Title VII of the Civil Rights Act of 1964, that no unlawful discrimination existed in the current hiring and recruiting practices, and refused to consider the question of back pay because the issue was not presented by the Attorney General at the trial. We remand with directions to amend the transfer plan, review the

clerical and technical hiring practices and try the back pay issue on its merits.

Hayes operates a plant in Birmingham, Alabama, for the manufacture, refurbishing and repair of military aircraft. When the company began its operations in 1951 all Negroes hired were placed in separate lines of progression and seniority divisions in the production and maintenance unit. This was allegedly done because none of the Negroes who applied had any experience or qualifications for technical jobs and it was felt by the management that it would be better to segregate them so they would not have to compete with the more experienced white people. This situation continued until 1962 when Hayes transferred thirteen Negroes to all white jobs.

In October, 1965, shortly after the effective date of the 1964 Civil Rights Act, Hayes reached a peak employment of 5,-200. Since that time there has been a general reduction in force except for some sporadic rehiring in early 1966. At the time this suit was filed there were 1781 employees in the production and maintenance unit of which 145 were Negro. 122 of these Negroes were in all Negro jobs.

In 1966 a discrimination charge against the company was filed with the Equal Employment Opportunity Commission. In an effort to dismantle its segregated lines of progression, Hayes and the union, in their March, 1968 collective bargaining agreement, placed one Negro line of progression in a seniority division [1] that contained five all white lines of progression. Other all black jobs were merged into a line of progression that had previously been predominantly white. Hayes had also begun to hire whites for the historically all Negro jobs and hire Negroes for jobs that had formerly been all white. The EEOC recommended a transfer plan for the Negro employees who were in the all Negro jobs. Conciliation conferences between the Commission and Hayes broke down in March, 1968 and suit was filed by the Attorney General under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–6(a),[2] alleging discrimination against Negro employees in the company's hiring practices and by limiting them to

1. The Hayes plant is composed of a production and maintenance unit and an office and technical unit or branches. The union represents only those employees in the production and maintenance unit. That unit is divided into nine seniority divisions. Within each seniority division are several functionally related lines of progression. Within these lines the jobs are arranged so that the lower jobs may, when necessary, train employees and give them the experience necessary to successfully perform the higher jobs.

An employee's plant wide seniority entitles him to certain rights within his seniority division. These rights are not normally transferrable should he transfer to another seniority division.

2. 42 U.S.C.A. § 2000e–6(a)

Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the

United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

3. 42 U.S.C.A. § 2000e–2(a)

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

the lower rated jobs in all Negro lines of progression in violation of 42 U.S.C.A. § 2000e–2(a).[3]

In April, 1968 a plan similar to the one recommended by the EEOC was adopted by Hayes for the benefit of all negroes in predominantly Negro jobs who were hired prior to March 28, 1968. After studying the personnel files of the 141 employees eligible under the plan Hayes determined that none of them were qualified to be transferred to any jobs above the entry level. These employees were afforded the option of transferring to any entry level job for which they were qualified after all other employees had exercised their rights under the collective bargaining agreement. Each employee was informed which of the 57 entry level jobs he was qualified for and was allowed to state his preference as to those jobs. As vacancies occurred, the employees who stated a preference for those vacancies were by seniority offered the job. If an employee did not wish a transfer or declined an offer Hayes was not obligated to make further offers. However, many of the employees were allowed to return to the program after they had first refused a transfer. Once accepted, the employee retained his previous wage rate if the new pay grade was less and retained his plant seniority for promotional purposes.

■ After Hayes had initiated this transfer plan the Attorney General applied for a preliminary injunction which was denied. The denial was reversed on appeal. United States by Mitchell v. Hayes International Corp., 5 Cir. 1969, 415 F.2d 1038. This Court found that the transfer program may have been unduly limited because it offered only 57 out of a possible 140 jobs and because the employees were given only one opportunity to transfer; that past employment statistics demonstrated illegal hiring practices; and that remanning, recall and layoff rights in the collective bargaining agreement might also show the effects of past discrimination had continued. Upon remand a hearing on the merits was held rather than upon the application for a preliminary injunction. The district court concluded that the transfer plan adequately provided an opportunity for Negroes to attain their "rightful place"[4] and that current recruitment and hiring practices did not violate Title VII. All relief was denied, including a post-trial request for back pay which was refused on the ground that the Attorney General had failed to present the issue during the trial.

### THE TRANSFER PLAN

Under the Hayes transfer plan 95 of the 141 eligible employees desired transfers. Of the 95, 59 had accepted transfers into formerly predominantly white lines of progression at the time of the final hearing in November, 1969.

The Attorney General attacks the plan as inadequate for the following reasons: (1) the plan limited the transferees to entry level jobs in the production and maintenance unit although some of them were qualified for other jobs; (2) the plan provided for a single opportunity to accept or decline a transfer; (3) remanning and downgrading practices would continue the effects of past discrimination of the transferees and because of this many of those eligible declined the opportunity to transfer.

---

4. The "rightful place" theory, adopted by this court in Local 189, United Papermakers & Paperworkers v. United States by Mitchell, 5 Cir. 1969, 416 F.2d 980, cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L. Ed.2d 100, is that any disadvantage presently operating against incumbent Negroes due to past discriminatory practices violates Title VII and should be eliminated by giving them an opportunity to compete for openings in the "white" jobs from which they were heretofore excluded on the basis of their ability to perform and plant seniority without regard to the seniority expectations of junior white employees. This would require an adjustment in the competitive standing with regard to future job movements arising in the ordinary course of business. Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260, 1268 (1967).

Hayes had obviously discriminated against Negroes in the past by segregating them in lower paying all Negro lines of progression. By remaining in these lines they continued to be affected by the past discriminatory practices since they were not in a position to compete with other employees for the better paying jobs for which they may have been qualified. Current promotion practices and other rights granted employees, in so far as they may limit the transfer program by imposing barriers to the incumbent Negroes' opportunity to achieve their rightful place consistent with their ability and plant seniority, are in themselves Title VII violations. *See* United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418, 439–440; Local 189, United Papermakers & Paperworkers v. United States by Mitchell, 5 Cir. 1969, 416 F.2d 980, 991, cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100. Affirmative action is necessary to remove these lingering effects. *See* United States v. National Lead Co., 8 Cir. 1971, 438 F.2d 935, 937; Parham v. Southwestern Bell Telephone Co., 8 Cir. 1971, 433 F.2d 421, 427; Local 53, International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, 5 Cir. 1969, 407 F.2d 1047, 1052. Recommendations for change were first made by the EEOC in the form of a proposed transfer plan. A variation of this plan was implemented by Hayes. The plan seems to be working well; however, it is deficient in several respects.

Although Hayes appears to have made an effort to eliminate the effects of past discrimination through the transfer plan, it has limited the transfer opportunities to entry level jobs in the production and maintenance unit. The district court found that " . . . [The] limitation of jobs offered to entry level jobs denied no affected class employee transfer opportunities consistent with his seniority and qualifications." There appears to be contradictory evidence to this all inclusive finding. Harris, the assistant director of industrial relations at Hayes, testified both in court and in his deposition that under the contract with the union there could be no transfers to an "A" job as long as there are "B" people qualified to perform the "A" job. This rule played an important role in the selection of jobs that were made available in the transfer program. According to Harris this meant that an upper level job could not be considered for the transfer program as long as there were qualified individuals in the job below.[5] This method of selection would obviously preclude an incumbent negro's transfer to a job which he is qualified to perform and senior enough to be preferred. The fact that a contract required this limitation is not a justification if it is discriminating. United States v. Jacksonville Terminal Co., *supra*, 451 F.2d at 454.

To determine vacancies in this manner is to let the old job seniority criterion denounced in Quarles v. Philip Morris, Inc., E.D.Va.1968, 279 F.Supp. 505, 513 in through the proverbial back door. The court must determine not only whether the seniority and ability of the incumbent Negroes entitle them to existing vacancies but must also insure that potential vacancies are not foreclosed by criteria that puts the Negro at a disadvantage due to past discriminatory practices.

Other evidence simply confuses this issue. Ford, an assistant director of industrial relations, testified that under the collective bargaining agreement no employee could be transferred to a job if there were qualified senior individuals in the job below. It would appear that this is the same contract provision referred to by Harris except that Harris did not refer to the seniority of those qualified in the next lower grade. Since Harris is the one who selected the jobs for the transfer plan we cannot be sure that he took the seniority of the individuals next in line into account when

---

5. Harris testified that a Roosevelt Bitten was qualified to be a stock clerk but that this job was always filled from the position immediately below, i. e., a material-handler-stamper.

he determined which jobs were vacant and available for the program. Because there is nothing in the record to indicate whether or not this was considered, we are unable to find a solid factual basis for the district court's finding. We remand this issue for clarification and a further fact finding.

■■ The transfer plan did not offer the opportunity to select a technical or clerical position when there were incumbent negroes qualified for these jobs. The finding that none of the potential transferees were qualified for a job not offered is therefore erroneous. Hayes explains its failure to offer clerical jobs as part of the transfer plan by saying that these jobs were not covered by the collective bargaining agreement and therefore the wages are generally lower than in the maintenance and production unit and seniority does not play a part in job security. It therefore reasoned that none of the potential Negro transferees would be interested. While this may prove to be true, the Civil Rights Act provides for equal opportunity to select and compete for a job notwithstanding its lower pay or other disadvantages. United States v. National Lead Co., *supra*, 438 F.2d at 939. United States by Mitchell v. Hayes International Corp., *supra*, 415 F.2d at 1043. The potential transferees who desire and qualify for a clerical or technical job should be afforded the opportunity to apply for it.

In addition to excluding the transferees from clerical or technical jobs, they may also have been denied a transfer to a desired job because another employee exercised his remanning or recall rights. Under the collective bargaining agreement an employee has a preference for a job from which he had been remanned or laid off. These rights also protect the sequence in which one is laid off or remanned as well as the order in which one is promoted when vacancies occur.

If an employee in a "B" job is either laid off or remanned to a beginner job, he would be entitled to the "B" job before another beginner even though the other beginner was also qualified and more senior but had never held the "B" job. This is what is known as a remanning right. The recall rights are also similar. These rights appear to be neutral on their face, but have the effect of allowing a residuary disadvantage to those senior negro employees transferred to lower classifications who are also qualified to perform the higher jobs in that line of progression.

■■ Qualified Negroes with greater seniority cannot displace incumbent workers. However, they are to be given a preference for future vacant jobs absent a compelling business reason. Local 189, United Papermakers & Paperworkers v. United States, by Mitchell, *supra*, 416 F.2d at 988–989. Hayes attempts to justify these rights because it is necessary in times of rapid employee expansion to have experienced men rather than newcomers in the higher classified positions. While this may be considered a nonracial business purpose, we do not find it to be sufficiently overriding and compelling to outweigh the discriminatory effect it might have upon the negro transferee. United States v. Jacksonville Terminal Co., *supra*, 451 F.2d at 451; Robinson v. Lorillard Corp., 4 Cir. 1971, 444 F.2d 791, 798; Local 189, United Papermakers & Paperworkers v. United States by Mitchell, *supra*, 416 F.2d at 989. Furthermore the only person who would be preferred ahead of a junior experienced employee would be a senior qualified Negro transferee. This would not endanger the safe and efficient operation of the plant. *See* Local 189, United Papermakers & Paperworkers v. United States by Mitchell, *supra*.

■ Hayes further argues that this situation may never arise and even if it does, any detrimental effects would be temporary. These are not valid justifications. Nor can obligations under the collective bargaining agreement be relied upon for permitting these rights to prejudicially affect the negro transferee. Vogler v. McCarty, 5 Cir. 1971, 451 F.2d 1236, 1238; United States v. Jacksonville Terminal Co., *supra* at 454; Local 53, International Association of Heat & Asbestos Workers v. Vogler, *supra*, 407 F.2d at 1054; *cf*. Hutchings v. United

States Industries, Inc., 5 Cir. 1970, 428 F.2d 303, 313.

We emphasize that Hayes is not required to transfer an incumbent Negro to a job he is not competent to perform or not entitled to if there are other more senior qualified employees. Hayes is required to give an incumbent Negro an opportunity to transfer to a job he is able to perform satisfactorily ahead of another employee who has less plant seniority regardless of any rights guaranteed him by the union and company contracts.

With respect to the lay-off and downgrading procedures the district court found that it was not possible under the collective bargaining agreement for an employee holding a traditionally white position in a division to bump a more senior Negro employee who happened to be holding a lower job in that division. This is undoubtedly so if the Negro is in a classified position. However it could and did happen to employees in the beginner jobs. It was established that beginners would "go out the gate" first regardless of their seniority. This procedure perpetuates the effects of past discrimination upon the Negro employees who transfer to beginner jobs. It cannot be utilized against them.

The existence of this procedure may have also caused some Negro employees to refuse a job change under the transfer plan because, as the lower court found, they thought their seniority better protected them in their current jobs. Consequently, they must be given another opportunity to transfer.

We are of the opinion that Title VII does not require a bid system as advocated by the Attorney General nor is Hayes required to afford the incumbent negroes any more than one bona fide opportunity to transfer to their rightful place.

## HIRING AND OTHER DISCRIMINATORY PRACTICES

The hiring practices currently utilized by Hayes are alleged to be discriminatory. Hayes uses the Alabama State Employment Service (ASES) as a referral service for all new employees. All employees are hired through this service except when the demands for personnel are so great that the ASES cannot provide enough applicants. Hayes then also allows applicants to apply directly when they have experience in a skilled position for which Hayes is hiring. Hayes has also requested the Birmingham Urban League to refer qualified minority applicants.

The Attorney General asserts that the ASES referral program results in the hiring of fewer negroes when compared to an open gate policy of direct application. The facts are in dispute on this point. We conclude that the district court was not clearly erroneous in finding that the ASES system of referral was not discriminatory. Since 1968 29% of the applicants referred were negro and 30.6% were hired. Hayes has hired a greater percentage of negro referrals than white referrals.

The Attorney General questions other hiring practices allegedly used by Hayes, i. e., allowing friends and relatives of employees to apply without first being referred by ASES, attempting to hire former employees and the exclusion of negroes from technical and clerical jobs. The friends and relatives procedure is alleged to be discriminatory because there are more white employees than negro employees. See Parham v. Southwestern Bell Telephone Co., supra, 433 F.2d at 426–427; Lea v. Cone Mills Corp., M.D.N.C.1969, 301 F.Supp. 97, 102 aff'd in part, vacated in part, 4 Cir. 1971, 438 F.2d 86. Two examples of related applicants who were hired without first being referred by ASES were proferred. The Attorney General also relied upon the applications of 151 whites and 31 negroes who were hired without an ASES referral which listed friends or relatives employed by Hayes. The Attorney General does not claim that the friends or relatives of employees were preferred over other applicants as was the case in Parham and Cone Mills, only that they somehow had easier access to an applica-

tion. This evidence does not amount to a *prima facie* showing of. a discriminatory practice.

Since 1968. Hayes has not attempted to rehire its former employees. Even though most of the former employees were white, there is no showing that this method of hiring has operated or will. necessarily operate to exclude qualified negroes from being hired ·under other hiring practices. Moreover, the record reflects that this procedure was employed only when the company received a new contract which rapidly created an expanded demand for help and the ASES was unable to meet that demand.

With respect to the technical and clerical hiring practices the Attorney General has introduced some impressive statistics. While we abjure any desire to become involved in a numbers game, statistics such as these do have some relevance in a Title VII pattern and practice suit. *See, e. g.,* United States v. Jacksonville Terminal Co., *supra,* 451 F. 2d at 442; Bing v. Roadway Express, Inc., 5 Cir. 1971, 444 F.2d 687, 688–689.[6] The statistics here reveal that at the time the suit was brought Hayes employed 918 whites and 6 Negroes in office and technical positions. Between that time and October, 1969 an additional 285 whites and 14 Negroes were hired in office and technical jobs. Population figures reveal that Birmingham is composed of roughly 30% Negroes.

■ These lopsided ratios are not conclusive proof of past or present discriminatory hiring practices; however, they do present a *prima facie* case. The onus of going forward with the evidence and the burden of persuasion is thus on Hayes. Hodgson v. First Federal Savings and Loan Ass'n, 5 Cir. 1972, 455 F.2d 818, 822; United States v. Ironworkers Local 86, 9 Cir. 1971, 443 F.2d 544, 550–551.

■ The district court found that "there was no evidence in the record to support the inference that the high ratio of whites to blacks in the office and technical unit indicates that there has been racial discrimination in the hiring for that unit." . We disagree. The inference arises from the statistics themselves and no other evidence is required to support the inference. At this stage of the proceedings it was not necessary for the Attorney General to show the availability of skilled Negroes in the community to perform the jobs in question because the burden of going forward and showing the lack of qualified Negroes was upon Hayes. This burden is not met by Hayes' attempts to parry specific allegations of alleged discrimination, e. g., the four Negroes rejected after failing a typing test and the one turned away for being overweight, or by company officials stating in general terms that no one was refused employment solely because of their race. *See* Turner v. Fouche, 1970, 396 U.S. 346, 360–361, 90 S.Ct. 532, 24 L.Ed. 2d 567.

■ We cannot accept the finding that there is a lack of qualified Negroes available .to fill these jobs because of the cultural and educational deprivation suffered by the Negro race. Local 189, United Papermakers & Paperworkers v. United States, *supra,* 416 F.2d at 988. There is no evidence to this effect in the record. Moreover, we cannot find any substantial affirmative evidence which shows a lack of available qualified negroes.[7] Because the district court failed to apply the proper legal standards we remand this issue for a further hearing and determination.

We have considered all other points raised by the Attorney General and find the district court's disposition of them not to be clearly erroneous.

6. The Eighth Circuit has held that statistics alone can, as a matter of law, establish a Title VII violation. Parham v. Southwestern Bell Telephone Co., 8 Cir. 1971, 433 F.2d 421, 426.

7. In fact, the ASES record of applicants tends to show that there is no lack of negro applicants for categories labeled "professional, technical, managerial and clerical." Plaintiff's exhibits nos. 121–124. These records do not show the qualifications of these applicants, only that they have applied.

The district court failed to determine whether there were any violations of Title VII between the effective date of the Act and 1968. Such findings need to be made in order to properly dispose of the case.

■ The back pay issue was not specifically raised until the post-trial stage of the litigation. The district court accordingly refused to entertain it. We think that the broad aims of Title VII require that this issue be developed and determined. It should be fully considered on remand. Fed.R.Civ.P. 15(a); *see* Rosen v. Public Service Electric and Gas Co., 3 Cir. 1969, 409 F.2d 775, 780 n. 20.

In summary, the case is remanded to the district court with directions to amend the transfer plan to correct the deficiencies we have pointed out, reconsider and make further findings of fact and conclusions of law concerning the technical and clerical hiring practices, and hear the back pay issue on the merits. As to all other issues raised on this appeal, the judgment of the district court is affirmed.

Affirmed in part, reversed in part and remanded with directions.