David **BUCKNER** et al., Plaintiffs,

v.

**GOODYEAR TIRE AND RUBBER COMPANY**, a corporation, et al., Defendants.

Civ. A. No. 70–844.

United States District Court,
N. D. Alabama, M. D.

March 7, 1972.

David H. Hood, Jr., Bessemer, Ala., for plaintiffs.

Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala., for defendants.

## MEMORANDUM OF OPINION AND ORDER

POINTER, District Judge.

This action, presaged by charges filed with the EEOC in 1967 against Goodyear Tire & Rubber Company, was brought by the plaintiffs, seven black employees of Goodyear, under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq. Injunctive relief and back pay are sought under Title VII and under Rule 23 for the benefit of all black employees hired by Goodyear after 1958. Local 12, United Rubber, Cork, Linoleum and Plastic Workers of America, the bargaining representative for production and maintenance workers at Goodyear's plant at Gadsden, Alabama, was added as a defendant in view of the possibility of a decree affecting the terms of the collective bargaining agreement.[1]

Proceedings in this case were temporarily stayed to allow further conciliation efforts through the EEOC. These efforts were partially successful, principally in matters relating to hiring and recruitment practices, use of company facilities, and commitment to non-discriminatory employment policies. Three subjects remain in dispute: (1) the validity of tests used by Goodyear in selecting entrants into its apprenticeship program; (2) whether discrimination remains in the assignment of lockers; and (3) whether promotion and transfer policies are discriminatory or perpetuate the effects of past discrimination.

Plaintiffs were at trial allowed to amend their complaint to assert a cause of action under 42 U.S.C. § 1981 in addition to that under Title VII. The amendment was sought not on the premise that the ambit of § 1981 is broader than that of Title VII, but rather in hopes of extending the applicable period of limitations. It is undenied that there were employment practices discriminatory against blacks prior to March 15, 1962; plaintiffs not only say that these practices have significance in determining under Title VII the perpetuation effect of post-1965 practices, but also seek monetary compensation for the pre-1962 discrimination.

## I. OVERVIEW

Goodyear is engaged at its Gadsden plant in the manufacture of tires and tubes for cars and trucks. Its some 3,550 employees can be roughly grouped as follows: non-bargaining unit employees (managers, supervisors, professionals, technicians and clerical workers), 625; craftsmen, 325; and production workers, 2,600. Black employees constitute approximately 7% of the work force, with virtually all being in production jobs.

Prior to 1962 the company and the union adhered to a number of employment practices discriminatory against blacks—practices followed in fact although in no way authorized by the formal collective bargaining agreement. Work in a few departments was reserved exclusively for black employees; work in the others, exclusively for white em-

---

1. These plaintiffs were among the principal protagonists in earlier litigation concerning Local 12's failure to provide black employees with fair representation in their grievances against discriminatory practices which existed prior to March 1962. See Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers v. NLRB, 368 F.2d 12 (5th Cir. 1966), cert. denied 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967). Two postscripts to this episode should be noted: (1) The grievance in question was actually submitted to arbitration following the NLRB mandate, making the decision of the Court of Appeals essentially moot. The arbitrator denied the claim for back pay losses occasioned under the pre-1962 practices. (2) However, grievances which black employees have had since 1962 have been (the court finds) fairly and fully—though not always successfully—presented and pursued by the union.

ployees. Promotions, transfers and lay-offs were determined from three separate seniority lists, one for white males, one for black males, and one for females. Restroom and bathhouse facilities were formally segregated on the basis of race as well as sex.

Effective March 15, 1962, Goodyear entered into a "Plans for Progress" program for equalization of job opportunities. The three seniority lists were combined into a single, consolidated plant-wide roster; exclusion of persons from particular jobs or departments on account of their color was renounced; facilities were declared to be available without regard to race; and the company announced its intention to hire and promote in a non-discriminatory manner.[2] Significant changes have taken place in the employment opportunities for blacks as a result of this program; the perception of how adequate and sufficient have been the changes tends to have a direct correlation with the color of one's skin.

Goodyear performs only what are essentially administrative functions in the assignments and promotions for production jobs. Interested employees sign their names to notices of job vacancies posted on bulletin boards. The job goes to that bidding employee having the longest plant-wide seniority, except that an employee with "prior similar service experience" is given preference over more senior employees having no such experience. Each production job is basically an original entry position; there are no lines of progression. Eligibility for "PSE" preference was given a liberal interpretation under an arbitration decision in March 1964; and it is clear under the evidence, if not actually admitted by the plaintiffs, that use of the "PSE" factor has not worked to the disadvantage of blacks bidding on jobs since that date.

Transfer into craft jobs presents a different situation because other plant jobs do not provide comparable experience or necessary skill development. Over the years approximately 90% of the craft vacancies have been filled through employment of outside journeymen. A few—only six since 1965—have been filled by bidding production workers, but in virtually each such case the employee was a journeyman craftsman who had taken a production job with Goodyear until some vacancy should occur in the craft positions. The remainder of the craft jobs have been filled through Goodyear's apprenticeship program, which has had nine new classes started over the past fifteen years. Selection of members of the apprenticeship program is made by Goodyear, with use being made by it of a battery of tests.

Non-bargaining unit positions are filled by Goodyear both by outside hiring and by internal transfers. The internal transfers have, with rare exception, been made by Goodyear only after a request for such transfer or promotion made by the interested employee.

## II. TEST VALIDATION

Use of tests by employers is recognized as a permissible tool for personnel actions under limited conditions:

> [N]or shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. 42 U.S.C.A. § 2000e–2(h).

There must, however, be a demonstrable relationship between the test and the successful performance of the job for which the test is used. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971). In line with the

---

2. In 1968 Goodyear adopted an "Affirmative Action Program," committing itself to the active recruitment and advancement of blacks in higher paying positions.

suggestion made in such cases, the company has here attempted to establish such a validation following the method[3] outlined in the EEOC Guidelines. See 29 C.F.R. §§ 1607.1–1607.9 (1971). The court concludes from the evidence that the company has carried its burden— that there is a demonstrable relationship between the tests used and the job (*i. e.,* participation in the four year apprenticeship program) for which the tests are used.

■ The apprenticeship program is a four year, 8000 hour, program. Six hundred hours of academic course work is conducted at Gadsden State Junior College; the other hours consist of on-the-job training at the plant under a journeyman craftsman. Tuition and expenses at the college are paid by Goodyear, and of course the apprentices are in Goodyear's payroll during the program. The cost to the company per class member was estimated at $36,000 for the four year period, the greater cost coming in the first years when the apprentice is thought to provide little benefit to the company in his on-the-job training. The objective of the program is to produce at the end of the training period persons qualified for employment in several of the key craft jobs at the Gadsden plant.[4] The number of persons to be selected depends upon the company's projected needs for future craft positions, and has ranged from a low of four class members to a high of seventeen in another.

The classes were reinstituted on a regular basis in 1956.[5] Beginning in 1964 new classes were started each year (rather than waiting for the "graduation" of the prior class), and this practice has been followed in each subsequent year except 1970. Applications are solicited through notices posted on plant bulletin boards and notices to high schools in the area. Applications have far exceeded the number of persons to be selected. By way of example, for the 1971 class, with ten spots to be filled, there were 241 applicants.

No person has been selected for entrance into the program since 1956 without successfully completing a series of aptitude tests. The tests—the California Test Bureau Mathematics Test, the Otis Mental Ability Test, the Bennett Mechanical Comprehension Test, the Educational Testing Service Reading Comprehension and Expression Test, and the Minnesota Paper Form Board Test— were adopted upon the recommendation of an independent professional consultant in guidance and testing. The same tests are used in apprenticeship selection in Goodyear's plant in Akron, Ohio. The tests are administered in the plant (with no suggestion in the evidence of impropriety in such administration), and are scored on objective standards prescribed by the test publishers. It is

3. Plaintiffs argued that any tests must be validated *by* the EEOC, rather than by the company, or experts hired by it. The regulations in question do not, however, provide for the EEOC to make validation studies of tests used by private employers, and it seems doubtful that it would have the manpower or the financial resources to conduct such studies. Rather, the regulations establish a *method* by which studies are to be made by employers or those employed by it. The adequacy of such studies can be challenged in litigation (such as the case *sub judice*) ; there is no requirement that the study be submitted to the EEOC for its conclusions.

4. Notwithstanding this objective, the court has concluded that the tests need not be

validated as against job performance in the craft job itself, but only as against performance in the four-year apprenticeship "job." However, the relationship between the apprenticeship program and the filling of craft job vacancies then becomes also a matter for inquiry (see *infra*) ; for, if the practice has the effect of discriminating against blacks (which could be the consequence of such a test even though validated), the question would be whether there is a business necessity justifying such discrimination.

5. The first class was started in 1937, and a second was begun in 1941.

clear that no one is given any coaching or an advance copy of the tests.

A validation study was conducted by independent professional consultants in Fall of 1971. The study followed the method set forth in the regulations, 29 C.F.R. §§ 1607.1 et seq. Details of the study were presented to the court by several witnesses and numerous exhibits. It included both a criterion-related validity study and a content validity study. The sample did not contain any blacks at the Gadsden plant for the reason that at that time there were none [6]; however, it did contain a sufficient number of blacks at Goodyear's Akron plant to allow for minority validation. No significant differences exist between units and jobs at the two plants, and to the extent it may be considered there are significant differences between Akron blacks and Gadsden blacks the test may still be held as at least provisionally valid regarding Gadsden pending further review when technically feasible. 29 C.F.R. § 1607.4(a), (c) (2); § 1607.5 (b) (1). The evidence is clear, and the court so finds and concludes, that the tests used by Goodyear have a demonstrated significant relationship to behavior and success [7] in the apprenticeship program and that alternative procedures of comparable utility are not available to it.

■ There is the complaint that, even if now validated, the tests were used prior to a formal validation study—indeed, going back to 1956. The answer is that, at least prior to 1965, it could hardly be said that the law required such a formal study. Goodyear did make bona fide efforts at the time of establishing the testing procedure to get the best advice available from professionals in the field, and under the testimony reviews (albeit not to the extent of a detailed validation study) have been made of the testing system in the intervening years. It is doubtful that 42 U.S.C.A. § 2000e–2(h) requires formal validation prior to use; rather it appears that a company could use a test subject to the risk that in later litigation it would suffer the consequences should the test not be proved valid. The regulations themselves permit continued use of tests prior to validation under specified conditions. 29 C.F.R. § 1607.9.

The fact that the tests have been used since 1965, though prior to validation studies, is of some support to the company rather than the plaintiffs. First, it is clear that whites have not been allowed to enter the apprenticeship program without having to take the test. *Cf.* United States v. Jacksonville Terminal Co., 451 F.2d at 451–452 (5th Cir. 1971). Secondly, any intimation that institution of the tests was intended to block Negroes from the apprenticeship program is without merit; for at the time the tests were instituted blacks were openly foreclosed from the better jobs at Gadsden and would not have even been allowed to take the tests.

■ The tests are used to pare the applicants down to those likely to successfully complete the training; the company still has more persons who pass the test than positions in the new class. Plaintiffs have questioned the company's selection process from among those who do pass the test, and have presented as a witness a black employee who, though passing the tests, was not selected for the 1971 class. The facts are these: there were 17 blacks and 224 whites who applied for the '71 class. Three blacks and seven whites were selected. While there was one black who passed the test but was not selected, there were more than fifteen whites similarly passed over. It may be noted that 23% of the black applicants passed the

---

6. Three of the ten members of the 1971 class are black. The study was conducted using persons who had completed one or more years of the program.

7. It is at least of some significance that since the tests were utilized no one selected for the program has failed in either the academic or practical phases of training, though a few have dropped out before completion.

test, while less than 15% of the white applicants passed; that of those who passed the test, 75% of the blacks were selected for the program, with only approximately 40% of the whites being selected. The statistics belie any claim of discrimination in the post-test selection process (and, indeed, for the year 1971 that the test is itself discriminatory against blacks).[8]

## III. LOCKER ASSIGNMENTS

Restrooms, locker rooms, drinking fountains and other facilities were declared to be available to employees without regard to race; and the signs which formerly announced a segregation of such facilities were removed. The policy was not instantaneously self-executing—it involved some testing by a few daring blacks, the gradual acceptance by whites, and some dismantling and remodeling work by the company. It was not until 1969 that the policy could be fairly said to have become a reality.

This lawsuit, filed in 1970, complains that there still remains one vestige of the prior discrimination—that the number of blacks having adjacent lockers occurs too frequently in a plant where blacks constitute less than ten percent of the work force.

There are a number of locker rooms, spread about the plant for convenient proximity to the various work areas. Assignment of employees to the locker room nearest their place of work can hardly be criticized even though (because some departments have a somewhat higher percentage of blacks than others) this results in some disparity in the relative number of blacks in any particular locker room. Plaintiffs do not challenge this procedure, as well they should not, at least in a plant where blacks are spread throughout the various departments (albeit not with absolute uniformity).

The irritant is that within particular locker rooms blacks too often (statistically) have adjacent lockers—with some instances of three or four blacks side by side. Assignments within locker room were formerly made by guards, but recently have been made "at random" by the company's personnel department (who—the unstated assumption is—are less likely to be racially prejudiced than were the guards).

 It would be statistically *improbable* in a random selection for a ten percent minority to be spread one each ten lockers; some bunching is probable. Most of the minority would be expected —and this is the case here—to be between two persons from the majority group. The relatively high number of instances of bunching—considered in conjunction with the lack of evidence concerning the details of the "random selection" procedure used by the company— convinces the court, however, that some limited form of corrective action should be required.

Plaintiffs' request for reassignment in alphabetical order would entail, in the court's opinion, undue shuffling and disruption among the employees, coming so recently after a prior reassignment; and, indeed, alphabetical assignment, while eminently non-discriminatory in intent, could easily produce more instances of racial bunching than what presently exists. A more direct remedy —the one which the court here orders —is that, to the extent of present locker vacancies (or those which arise during the remainder of this calendar year), the company accord blacks who have a locker next to another black employee the option of moving to such other locker

---

8. The cold fact still remains that the class of '71 was the first to have black members. Well in excess of 90% of the applicants, however, have been whites. It may be assumed that the tests in earlier years did disqualify blacks at a higher rate than whites, for indeed there is no evidence that except in the year 1971 was any black who successfully completed the tests ever passed over by the company for selection. While three (the three in the '71 class) blacks as compared with 75 whites selected for the program since 1962 is an obviously low selection rate, it is comparable to the application rate during the period.

in the same locker room. This directive should not be understood as precluding the company at some future time from undertaking another general reshuffling of locker assignments, whether by "random selection", by alphabetical arrangement, or by some other non-discriminatory method.

## IV. ASSIGNMENT AND TRANSFERS

■ As previously indicated, discrimination was openly practiced against blacks prior to March 15, 1962, both by limiting blacks to certain jobs (generally lower paying and of lower status) and by maintenance of separate seniority rosters for black and white employees. These practices were changed in 1962 by opening up all jobs to blacks (at least "on paper") and by establishing a single plant-wide seniority list for all employees. The question for decision here is whether under Title VII the practices followed since July 1965 either are themselves discriminatory against blacks or, though facially neutral, perpetuate the consequences of the prior discrimination. The burden on the company to show business necessity in justification of such practice is heavy indeed. Bing v. Roadway Express, Inc., 444 F.2d 687 (5th Cir. 1971).

## A. LIMITATION PERIOD FOR § 1981

Plaintiffs, in amending their complaint to state a cause of action under 42 U.S. C.A. § 1981, are seeking direct relief for the admittedly discriminatory pre-1962 practices (and not merely pointing to such practices as a vantage point from which to measure the continuing effects thereof under Title VII). The court concludes that these claims are barred from presentation in this 1970 lawsuit.

■ The applicable period of limitations is determined by referring to that provided for comparable claims under state law, 42 U.S.C. § 1988. Recitation of this principle is, however, far easier than its application.

Goodyear suggests the one year period of Alabama Code, Title 7, § 26(1), for the recovery of wages, etc., under special acts; but this statute has been ruled unconstitutional. Caldwell v. Alabama Dry Dock, 161 F.2d 83 (5th Cir. 1947). Nor does it seem apt, as Goodyear alternatively urges, to categorize the award of back pay relief under § 1981 as "a penalty given by statute to the party aggrieved," also a one year period.[9]

Plaintiffs urge a 10 year period as prescribed by Alabama Code, Title 7, § 20, for actions founded on contracts under seal (i. e., the collective bargaining agreement), or, at the least, a six year period as provided under Title 7, § 21, for breach of an express contract.[10] Although not argued by either side, the three year period of Title 7, § 24, for breach of an implied employment contract also has some appeal. See Chambers v. Seay, 87 Ala. 558, 6 So. 341 (1888); Hood v. League, 102 Ala. 228, 14 So. 572 (1893).

Dictum in Boudreaux v. Baton Rouge Marine Contr. Co., 437 F.2d 1011 (5th Cir. 1971), indicates in a footnote that (absent a valid shorter period for recovery of wage) the action under § 1981 is essentially ex contractu. However, in a later case under a similar statute (29 U.S.C.A. § 401), the Court has held that an action in Alabama for a violation of one's federal rights is essentially ex delicto to which Alabama's one year statute applies ("any injury to the person or rights of another, not arising from contract, and not herein specifically enu-

9. In view of the holding (in denying a right to trial by jury) that such suits are, even as to back pay, essentially for equitable relief, Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122, 1125 (5th Cir. 1969), one may indeed ask whether, after all, the more appropriate standard should be the doctrine of "laches."

10. At the conclusion of the trial the court indicated its tentative conclusion that the six year period would apply. However, further study has indicated that this conclusion was in error.

merated"). Sewell v. Grand Lodge of Intern'l Ass'n of Machinists, 445 F.2d 545 (5th Cir. 1971).

The court here concludes that the holding in *Sewell,* albeit regarding a statute other than § 1981, must be given priority over the dictum in *Boudreaux,* albeit a § 1981 case. The plaintiffs' claims here for pre-1962 practices are not really for a breach of a promise, whether written or oral, but for a breach of a duty imposed by statute and constitution. Indeed, plaintiffs through arbitration long since concluded pressed their claims arising under the contract—while we do not hold that the arbitration precluded other court action, it is because the court action is based on the statutory duty independently of what the parties may or may not have agreed upon.

■ The matter does not end here, however, because of the "tolling" exceptions recognized in this type of case. Culpepper v. Reynolds Metals Co., 421 F.2d 888 (5th Cir. 1970) (period during which resolution through the arbitration processes is attempted); Boudreaux v. Baton Rouge Marine Contr. Co., 437 F.2d 1011 (5th Cir. 1971) (period during which resolution through conciliation procedures of EEOC is attempted). The complaint here was filed on November 18, 1970, nineteen days after the date of the "suit letter" from the EEOC advising the plaintiffs of the failure of conciliation efforts. The charges of discrimination had been pending before the EEOC since 1967, the earliest having been filed by plaintiff Granger on June 7, 1967. Giving full tolling for the period of the EEOC proceedings, it appears therefore that acts and practices of Goodyear prior to June 26, 1966, would be barred by a one year limitations period for § 1981.[11]

In view of the gap—of over two years —between the conclusion of the arbitration proceedings and the initiation of charges before the EEOC, the plaintiffs here gain no additional time for their § 1981 action. Efforts to bring the dispute to arbitration began in October 1961, but the tolling benefits to the plaintiffs should be considered as spent on March 5, 1965, when the arbitrator's decision was rendered.[12] To take advantage of that period, plaintiffs should have filed a § 1981 suit or charges before the EEOC by March 5, 1966.

■ The ruling that Goodyear's practices in the 1950's and early 1960's are barred from presentation under § 1981 (and of course under Title VII) does not, as previously noted, detract from their significance in measuring purpose and intent of present practices or in determining the continuing effects of such prior discrimination under present practices. That is, this ruling does not deny, and has not denied, the admissibility into evidence of earlier discriminatory practices, or the probative value thereof.

### B. PRODUCTION JOBS.

■ Transfers and promotions in the production jobs, which constitute almost 75% of the total work force, have been

11. It is unnecessary to decide the following questions: (1) Did the amendment, alleging § 1981, "relate back" to the filing of the action under Title VII? (2) Should tolling apply to acts or practices arising after the filing of the charge with the EEOC or outside the scope of such charges? *Cf.* Tedford v. Airco Reduction, Inc., (5th Cir. 1972) (Docket No. 71–1588, February 1, 1972). Also see Caldwell v. Nat'l Brewing Co., 443 F.2d 1044 (5th Cir. 1971). (3) Did the earliest of the charges start "tolling" for other members of the class, including those who later filed charges? (4) Should, con-

sistent with the approach taken in determining compliance with the 30-day limitation period of Title VII, the plaintiffs be given the extra several days between the date of the "suit letter" from the EEOC and the date they received the letter?

12. It is true that the dispute over the principle of fair representation between the union and the NLRB continued in litigation until 1967. See footnote 1 *supra.* It would be inappropriate, however, to consider this period as tolling the time during which the plaintiffs should bring an action against the company.

determined—both "on paper" and in reality—since March 15, 1962, on the basis of plant-wide seniority. There are no lines of progression, each job being essentially an initial entry level position; and since an arbitrator's decision in March 1964 black employees have suffered no disadvantage under a contract provision which gives preference to employees with prior similar service experience. A bidding system has been followed as vacancies arise; and there is no limitation on the number of transfers an employee may make (other than requiring an employee to remain in a new job for six months before transferring to another). *Cf.* United States v. Hayes International Corp., 456 F.2d 112 (5th Cir. 1972) (recognizing that such procedures are calculated to aid blacks, though not required).

█ No barriers have been imposed [13] which might deter blacks from gaining their rightful place through transfers— *i. e.*, no special layoff provisions, recall rights, remanning rights, etc. which would inure to whites having less plant-wide seniority but greater seniority in a particular job or department. *Cf.* United States v. Hayes International Corp., *supra*. Only by adopting a "but-for" approach (bumping incumbent junior whites) or by precluding whites from the seniority system (giving preference in future vacancies to blacks with less plant-wide seniority than whites) could blacks be given greater opportunities to gain their rightful place than that provided in the collective bargaining agreements in effect even prior to the passage of Title VII. Such remedies have been rejected in this Circuit. Local 189, United

Papermakers and Paperworkers, A.F.L.–C.I.O., CLC v. United States, 416 F.2d 980 (5th Cir. 1969); United States v. Hayes International Corp., *supra.* In any event, such action would be unnecessary here; almost 3,000 job vacancies were posted in the years 1963–65 (and approximately 8,000 were posted from 1966–71), affording ample opportunities for the approximately 300 black employees to exercise and re-exercise plant-wide seniority to gain their rightful places in the industrial community.

In proof of its contention that the effects of prior discrimination in the production jobs have been overcome, Goodyear at trial demonstrated that the wage level of the individual plaintiffs is greater than that of the two white employees who, in each case, were hired immediately prior to their employment. Voicing some concern that such selected comparisons might not mirror the general situation, the court at the conclusion of the hearing directed Goodyear to submit a print-out of its production workers, showing their present wages, race, and date of employment, and calculating the average wage scale for all whites employed in 1959 and 1960 as contrasted with the average for all blacks employed in such periods. The study reflects that the average of the actual hourly earnings (as of the pay period ending January 9, 1972) [14] for blacks employed in 1959 exceeds that of whites employed in that year, and likewise the average for blacks employed in 1960 exceeds that for whites employed in 1960. No comparison can be made for 1961, as no blacks were employed that year by Goodyear.

---

13. This is not to say that cultural barriers, born from painful experience—the skepticism of blacks towards white promises—may not have retarded the exercise by blacks of their new rights in the first few months following the March 15, 1962, agreement.

14. The study submitted in plaintiffs' second post-trial brief is not contradictory. (This study shows a disparity *at time of employment*—pre-1962—in pay scales of the black plaintiffs and those of ten white

employees who have subsequently been promoted to supervisory positions, the average disparity then being projected for 10 years, 52 weeks a year, 40 hours per week, as a claim for damages.) This projection fails to acknowledge the reality of changes brought about after March 1962. While the evidence does not establish the specific date by which the disparities had been eliminated, the court has concluded that this occurred (on the average) by the effective date of Title VII.

The court concludes that—with one exception—there is no violation of the rights of blacks under Title VII or § 1981 regarding production jobs. The exception comes about as a result of a provision in the collective bargaining agreement which has provided that an employee's seniority date be adjusted in the event he is laid off for a period longer than his prior employment with the company. Such a provision was in the agreement at the time the company was determining lay-offs on the basis of a separate seniority list for whites and for blacks. In 1960–61 there was a lengthy layoff of blacks, but not of whites—greater detail is reflected in the Court's opinion in the NLRB case, 368 F.2d at 14–15. The result is that several of the plaintiffs here were given seniority dates—which now are vitally important in any bidding on new vacancies, as well as on such questions as layoffs—subsequent to the seniority dates of whites hired after them. The effect of this past discrimination continues,[15] and is due to be corrected lest its poison be felt later. The company suggests that there may have been periods prior to 1962 when whites, but not blacks, were laid off; if so, the court concludes that it is only fair that the correction ordered likewise inure to their benefit.

The court therefore concludes and orders that the provision of the collective bargaining agreement calling for adjustment of seniority dates upon layoffs be restricted to those layoffs which occurred subsequent to March 15, 1962. Seniority dates of those employed prior to March 15, 1962—white and black—shall be readjusted to give credit for such pre-1962 layoffs. The company asserts that under its records retention system it will be difficult to determine questions regarding pre-1955 layoffs. If such proves to be the case, there is no reason why appropriate notices could not be posted on bulletin boards calling for employees who claim their seniority dates

were adjusted under the lay-off provision to request correction and state the basis for their request, with resort to the grievance procedure if necessary. It should be noted that the court is not calling for adjustment only where a particular layoff involved employees of one race only—which could necessitate rekindling old fires—but is calling for readjustment for all pre-1962 layoffs as having been a part of a racially discriminatory system. The readjustment in seniority dates here ordered is to be treated as prospective only—*i. e.*, in determining seniority for future transfers, layoffs, etc.

## C. "COMPANY" JOBS.

▪ Of the approximately 625 jobs outside the bargaining unit, only twelve are filled by blacks. Taken in conjunction with the admitted past discrimination against blacks, and the fact that many "company" jobs have been filled in the past several years, this statistical fact establishes a *prima facie* case of discrimination and made it incumbent upon Goodyear to come forward and refute the charge with something more than grandiose platitudes of their intent. Bing v. Roadway Express, Inc., 444 F.2d 687 (5th Cir. 1971); *cf.* United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971) (a pattern or practice case).

▪ As in the *Jacksonville Terminal* case the company here has sought to satisfy its burden by proving a non-discriminatory adherence to a "best qualified" applicant policy. In this connection Goodyear introduced credible—indeed uncontradicted—evidence of the special skills needed to perform all but two (guard and supervisor) of the non-bargaining unit jobs. Clerical jobs involved the least specialized skills; most were highly specialized (*e. g.*, registered nurse, chemical compounder, computer operator, professional engineer, control

---

15. There is no evidence however that the adjustment in seniority dates has to this date resulted in any black so situated being out-bid by a white employee hired after him.

board operator). The prerequisite skills were detailed job-by-job. While no showing was made of unusual skills needed for the position of guard (of which Goodyear has nine), the company did show that over the past ten years there had been only two vacancies, one being filled by a long-time employee (employed since 1940) who had developed a heart condition, and the other being filled by a person who had been a NASA plant guard for some six years.

The following sentence from the *Jacksonville Terminal* case, substituting only the word "plaintiffs" for the word "Government", is true here:

"Rather than attempt to contradict this testimony by showing that qualifications were not job related or that whites were preferred over blacks possessing equal or superior qualifications, the [plaintiffs] chose to stand on statistics elucidating the post-Act employment disparities." 451 F.2d at 446.

While this failure would not be fatal in a private Title VII case such as the one *sub judice*—i. e., an isolated act of discrimination could nevertheless be remedied—it does speak loudly to the claim for the class action relief.

The evidence is clear that in virtually every case of intra-company transfers from bargaining unit to non-unit jobs the employee took the initiative in requesting the transfer or promotion. A few have been initiated by the company, for example, to the job of quality control technician, but this is a position to which three blacks have been among those transferred. There is no showing of any black who has sought transfer to a technical, clerical, or professional position while having the requisite qualifications therefor being rejected. Initiative is a key element of a supervisory job; and the evidence is that of the only seven blacks who have asked for such a job,

six are presently either holding a supervisory job or in the "management training squadron". The seventh, whose request was made some eight months before the trial of this case, still has his application pending—he has not been turned down.[16] In short, there is an absence of proof that blacks have been denied company jobs for which they applied—and indeed an absence of any evidence suggesting that any barriers (other than the hesitation that stems from years of "stay in your place" social standards) have been imposed to their making such applications.

Plaintiffs challenge factually the company's stated policy of waiting for employee initiative regarding non-unit jobs. If in fact Goodyear did reach out into the bargaining unit to obtain supervisors, then, given the statistical results present here, it would be required to show that its actions did not pass by blacks equally or better qualified. But the plaintiffs' challenge is not sustained by the evidence. As proof, they point to the frequency of code "94a" in explanation of transfers to or between company jobs. This code is defined as "request of Company". The fallacy is that "request of Company" is to understood in *vis-a-vis* other reasons for transfer, such as seniority. The words themselves do indicate an initiative action by the company (i. e., "request"), but in practice this "request" has with rare exceptions only been after a prior application by an employee—and more accurately should read "selection by Company".

In their post-trial brief plaintiffs have pointed to the use of code 94a regarding some fourteen white employees, such information being found in the personnel records introduced in evidence. Several of these employees were called as witnesses, some by the plaintiffs, some by the defendants. In each case the employee indicated that he had applied for

---

16. The length of time during which the application has been "pending" should not be taken as a covert rejection. The evidence showed that applications for super-

visory jobs have not infrequently been held for considerable periods before the employee was given a supervisory job.

the company job—some on several occasions—prior to selection by the company. While not all fourteen were called, it would hardly be appropriate (particularly bearing in mind the problems of judicial management in a wide-ranging Title VII case) to infer that they would have offered evidence contradictory of that which was offered.

In preparing their post-trial brief plaintiffs have also discovered the words "no experience" on the personnel files of seven white employees transferred to company positions. The natural import of these words, at least if blacks had applied for the positions, would be damning to the company's position. The use of these words was not gone into at the trial; however, the personnel records themselves were introduced, and accordingly it is not inappropriate for the plaintiffs to make use of that information. Goodyear has responded by asserting that this caption does not indicate a lack of qualifications. Rather, the company says, this means that the transfer is for a temporary period in which the incumbent is absent from injury or illness and that, in accordance with the provisions of the collective bargaining agreement, no credit is to be given for such temporary work in gaining "prior similar service experience" preference for a future opening. So utilized, the "no experience" label for these white employees indicates that the seniority rights of blacks were being protected, rather than discrimination being practiced. A review of the personnel files compels the conclusion that the company's interpretation of this label is the correct one, for two of the seven employees had actually been supervisors for other companies before coming to Goodyear.

In conclusion, it is here held that no violation of the rights of plaintiffs and their class has been established under Title VII or § 1981 regarding the transfer and promotion of blacks to non-bargaining unit positions. It may be noted that, although long over-due, the entry of blacks into higher paying and more responsible positions at Goodyear is covered in the affirmative action program adopted by it in 1971. The minority objectives for its 1971 needs were met, and its objective for 1972 is to fill at least 5 of the expected 12 "company" vacancies from the minority group. These goals are included in the conciliation agreement reached through the EEOC prior to the trial of this case.

### D. CRAFT JOBS.

Of the more than three hundred craft positions, only three are filled by black employees—and these are recent enrollees in the four-year apprenticeship program. The implications under Title VII are obvious. United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971). As previously indicated, vacancies in the craft jobs at Goodyear are primarily filled by employment of outside journeymen, secondarily through its apprenticeship program, and a few through transfer of previously qualified production workers. The question of recruitment practices has been resolved through the EEOC conciliation agreement; it is not relevant to the issues in this case to delve into statistics regarding the availability of skilled blacks in the community who can be recruited for such jobs. Cf. United States v. Hayes International Corp., 456 F.2d 112 (5th Cir. 1972). It is, however, necessary to look at the opportunities available for blacks in production jobs to move towards craft jobs.

The company has undertaken to prove, and has established under the evidence here, that special qualifications and skills are necessary for the performance of the several craft positions available at its plant. These jobs are not only critical to efficiency of production, but also important to the safety of those working in production. More than half the time, a craftsman is working without direct supervision and is called uopn to exercise judgment in making decisions. The craftsman must be able to understand technical manuals and make mathematical calculations involving algebra, trigo-

nometry and kinematics. The requisite skills are not learned by experience in productions jobs; nor is there any insistence (indeed a denial) that prior experience must be had in the same or related positions in the rubber industry. *Cf.* United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971). Goodyear has submitted evidence as to the qualifications and experience possessed at time of employment by craftsmen hired since 1965; it is clear that the company has been consistent in its requirements, that it has not waived them for whites while insisting on them for blacks.

Since 1962 there have been only two applications by black production workers for transfer to craft positions. Plaintiff Douglass, employed by Goodyear in 1960, sought a carpenter's job, asserting as qualifications three years of work at a trade school in woodworking. He has not been so transferred. But there are only two spots for carpenters in the Gadsden Plant, one position being taken by an employee with seniority since 1943 and the other by an employee with seniority since 1936. There is no assertion that these two white employees, both senior to Douglass, lacked the necessary job qualifications. Similarly, T. F. Bright, a black employee, bid for the job of oiler, but it went to a white employee with greater seniority with the company. Again, there is no effort to dispute the qualifications possessed by the employee selected. The court concludes that Goodyear has carried its burden of rebutting the charge of discrimination in acting on requests for direct transfer to craft jobs.

There is, however, an indirect means for transferring to craft jobs, *i. e.*, through the apprenticeship program; and many blacks have unsuccessfully requested admission to this program. Their objective, of course, was not merely to get a four year job of apprentice, but to move into a permanent craft job upon completion of the program. While tests employed by Goodyear in selecting entrants to the program have here been determined valid—that is, significantly a prediction of success in completing the four year combined academic and practical work—it nevertheless remains that in years before 1971 blacks were as a consequence precluded from this method of obtaining a craft job. Since the company has through establishment of the apprenticeship program shown itself willing to assist workers in attaining the necessary qualifications for craft jobs, and since the program in practice has in past years worked only to enable whites to gain such qualifications, it becomes necessary to see whether this program—as distinguished from other training programs which might be implemented for the same objective but with greater opportunities for blacks—is a business necessity.

Goodyear's apprenticeship program was registered with the Department of Labor in 1956.[17] The appropriateness of the major portion of the training—the on-the-job training under the supervision of a journeyman—can hardly be disputed. The academic phase consists of courses at a local junior college in English (comprehension), Mechanical Drawing; Algebra, Trigonometry, Eng-

17. Attached to plaintiffs' post-trial brief was a letter from the Department of Labor, dated February 9, 1972, to the EEOC, advising that the registration had been cancelled February 22, 1971 "because there had been no active apprentices in the program since January 28, 1968." Goodyear's supplemental post-trial brief disclaimed any knowledge of such a cancellation and, in effect, asks that the matter not be considered by the Court since no evidence of such action was introduced during the trial and it has had no opportunity to contradict or explain the matter. In point of fact, the reason stated in the February 9, 1972, letter for the alleged cancellation of registration is contradicted by the undisputed evidence in this case —there have been over twenty active apprentices in the program at all times since 1964. In any event the question of continued registration is not deemed in this case particularly significant.

lish (composition), General Physics, and Principles of Economics. The company has failed to persuade the court that English composition and Principles of Economics are sufficiently related to the performance of the various craft jobs to require their successful completion as a condition to assignment of such jobs. The court directs that successful completion of such courses be deleted from any requirement for successful completion of the apprenticeship program, and that likewise entrance to the apprenticeship program not be affected by test score statistically valid only in predicting the likelihood of successfully completing such two courses.[18] The other academic courses have been demonstrated to be job related.

■ Even with such corrections in the required content of the apprenticeship program, it is not clear that it—that is, the other academic courses—are necessary to the training of potential craftsmen. Helpful and desirable, yes; necessary, perhaps not. The fact that most of the craftsmen have been journeymen employed from other companies (and, presumably, not all completed an academic training such as contained in Goodyear's program) suggests that such training is not truly a necessity. Nor has there been any effort to validate the asserted correlation between these courses and the craft jobs comparable to that needed to justify use of a test.[19]

The court has been asked by plaintiffs to abolish the apprenticeship program. Presumably what is meant is that transfers be allowed to production workers for something in the nature of on-the-job training, or probationary assignments without requiring (and hence disqualifying for lack of predictable success in completing) any academic courses. It may be assumed that plaintiffs are not asking that the company look only to the "outside" for qualified craftsmen, as this would be of no benefit to the plaintiffs and their class (blacks employed by Goodyear) and of limited benefit to other members of their race not presently employed by Goodyear.

The court should not lightly discard principles for an industrial community which have been ground out by those (the company and union) in the community, particularly when those principles were not adopted for racial reasons. In the present case the collective bargaining agreement has recognized for a number of years the utility of an apprenticeship program for training new craftsmen, and not provided for original entry into a subcraftsman status. This approach was adopted not to deny blacks entry into the crafts—indeed at the time they were not even considered eligible for consideration—but to determine which of the whites should have the opportunity of moving to craft jobs.

The court is persuaded that it should not reject altogether the formal apprenticeship approach, but should look for ways to increase the opportunities for blacks to participate . . . and hence ultimately to enter the craft jobs. The court has considered the suggestions and proposals tendered on this question by the plaintiffs, by the company, and by the union. The following provisions are hereby ordered:

1. Goodyear's proposal that, barring a major economic recession, an apprentice class of at least eight apprentices will be started in 1972, 1973 and 1974 is made a directive of this court.

2. Goodyear's proposal that it initiate a "prep" course to prepare blacks for possible entrance into the apprentice program is, with slight modification, made a directive of this court. The

---

18. This is not to deny the value generally of such courses, nor to preclude the company from continuing to offer such courses as an elective part of the apprenticeship course or from encouraging apprentices to take such electives.

19. The court is not implying that an apprenticeship program is itself a "test" under 42 U.S.C.A. § 2000e–2(h) or must be subject to intensive validation studies such as outlined in 29 C.F.R. § 1607.

company is to provide, at its cost, pre-apprentice academic training for 20 black applicants each year through a selected course of study conducted at a local educational institution and directly related to the entrance requirement of its apprenticeship program. Counseling of participants on such matters as academics, attitudes, job opportunities and deportment shall be provided to the extent so recommended by consultants knowledgeable in the field of black culture and tradition. Selection of participants will be done by Goodyear after direct contact with appropriate leaders of the black community, provided however preference shall be given to blacks presently employed by Goodyear.

3. Goodyear shall select for admission to its Apprenticeship Program at least one black for each white so selected provided there are a sufficient number of blacks who pass the minimum testing requirements and other eligibility requirements for entry into the program. This mandate shall continue until such time that the percentage of blacks in the craft jobs (including the apprentice program) is at least three-fourths of the percentage of blacks in the production jobs at which time Goodyear may revert to a "best qualified" standard of selection provided it is fairly and impartially conducted.[20] Blacks who have previously passed the eligibility requirements for admission into the apprenticeship program but were "passed over" for selection shall be entitled to preference in future selections (provided this shall not require that more than 50% of any class consist of blacks). The provisions of

this subparagraph shall not be construed as requiring the company to begin new classes after 1974.

## V. SUMMARY AND ATTORNEY'S FEES

By way of summary, this order provides (1) that an option be allowed certain black employees to change locker assignments to the extent of locker vacancies during the year 1972; (2) that an adjustment be made in the seniority dates for employees affected by pre-March 15, 1962 layoffs; (3) that two of the courses in the Apprenticeship Program be treated as electives, with any testing to predict success in such courses eliminated as a standard for selecting entrants to the Program; and (4) that blacks be given increased opportunities to participate in the Apprenticeship Program through a company-sponsored "prep" course and through a minority quota if sufficient number of blacks pass the tests. Other requested relief for the plaintiffs and members of their class, including requests for back pay, is denied under the findings and conclusions stated in this opinion.

The plaintiffs are entitled, however, to recover from Goodyear the costs of this proceeding and attorney's fees. Plaintiffs and Goodyear shall, within ten days from the entry of this order, advise the court whether an evidentiary hearing is desired on the amount of attorney's fees, whether the court is requested to make such award without taking evidence, or whether the parties can agree on the amount of such award. Goodyear and Local 12 shall each bear their own costs of this proceeding.

---

**20.** This does not imply that this percentage marks a cutoff for blacks in the craft jobs. Rather it is an arbitrary point at which to terminate the special preference being given blacks, which does involve to some degree a "reverse discrimination" for a period of time.