December 6, 1978

## 78-63    MEMORANDUM OPINION FOR THE SOLICITOR OF LABOR

### Comprehensive Employment and Training Act (42 U.S.C. §§ 6701-6710)—Wider Opportunities for Women (WOW)—Program Funding in the Metropolitan Washington Area

   This responds to your request for our opinion regarding the legality of funding the Wider Opportunities for Women (WOW) program in the metropolitan Washington area under Title III of the Comprehensive Employment and Training Act Amendments of 1978 (CETA), Pub. L. No. 95-524, 92 Stat. 1909. Your request also mentions several other programs directed toward women or members of minority groups and raises the general issue of the propriety of funding affirmative action programs such as those under CETA. Specifically, you ask that we address two questions: (1) whether § 301(a) of CETA, 29 U.S.C. § 871(a), authorizes the Secretary of Labor to fund programs designed to assist eligible, disadvantaged women and minorities in the labor market; and (2) whether funding of the WOW program providing training for women in skilled crafts in which they have been historically underrepresented is an appropriate exercise of the Secretary's authority under § 301(a).

   We have considered these questions in light of the recent decision in *Regents of the University of California* v. *Bakke*, 438 U.S. 265 (1978). Certain general principles emerge from that decision. We know that neither the Constitution nor Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, requires "color blindness" in federally funded programs. That is, race and ethnicity (and presumably sex) may be taken into consideration for some purposes. 438 U.S. at 284-286. Certain race-conscious programs may come into conflict with the Constitution and title VI even if they are intended to be remedial. Analysis of the legality of race or gender-conscious programs must, therefore, proceed on a case-by-case basis after a careful examination of relevant facts. Accordingly, we have not attempted to furnish advice regarding the legality of funding all the types of programs that might conceivably be directed toward women or members of minority groups. Instead, we have

focused on the legality of funding the specific training program in the skilled crafts now proposed as part of the WOW program.

We conclude that in light of the statutory amendments adopted as part of the 1978 CETA reauthorization legislation, Pub. L. No. 95-524, it is now clear that Congress has authorized the Secretary of Labor, under title III, to fund programs designed to assist women in overcoming particular disadvantages found to impede their entry into specific or general labor markets or occupations. By authorizing funding of programs designed to assist members of special target groups, Congress limited the participation in such programs to members of such disadvantaged groups, notwithstanding the language of the title VI analog included as § 132(a) of the Act, 29 U.S.C. § 834. So long as they are supported by adequate findings, we believe that programs similar to WOW directed toward disadvantaged groups and carefully designed to remedy the effects on past or ongoing discrimination will be sustained against legal challenge. In light of the Court's reasoning in *Bakke*, however, it is evident that programs drawn along racially or sexually exclusive lines are particularly prone to raise constitutional questions. We therefore advise, in light of the uncertainty prevailing in this area of the law and the risk of litigation presented by adoption of a sexually exclusive program, that you propose revising the administration of the WOW program. Recruitment efforts could continue to be directed toward women, and women would be presumed to meet applicable eligibility requirements; however, where male applicants can demonstrate comparable disadvantages, they should also be considered eligible for participation.

I.

The proposed project, the "Multi-Craft Program for Women," would provide counseling and training to 75 unemployed women residents of the District of Columbia in the field of electronics, as skilled auto mechanics, or as electrician or carpenter apprentices. Eligibility for participation in the program is limited to women.[1] While most trainees are also members of minority groups, the program is not racially exclusive in character. Training, both in the classroom and through field placement, would last from 7 to 14 months and would be provided by both industry trainers and program staff specialists.[2] Personal, professional, and group counseling would focus on possible problems at home and on the job in an attempt to prevent such problems from adversely affecting job performance.

We understand that for entry-level positions as auto mechanics and carpenter apprentices the industry does not require formal training as a prerequisite. With regard to entry-level jobs in electronics, however, employers prefer a technical school or high school education and they require 14 months of preparatory

---

[1]Applicants are required to achieve an acceptable score on a mechanical aptitude test and to demonstrate good mathematical computation skills. They must also be highly motivated and demonstrate some measure of self-confidence.

[2]The curriculum would include basic mechanics, basic electricity, beginning electronics, mathematics, communications, and work preparation.

training. We also understand that a portion of the basic program curriculum is comparable to high school instruction in such fields as mechanics and mathematics, which women may have been discouraged from pursuing, and it includes practical training in identification of tools similar to that traditionally provided to men in their home environment or in high school shop classes.

## II.

Funding of the WOW counseling and training program is proposed under Title III of CETA. Although the original version of the Act did not include a specific reference to women as one of the groups to be assisted,[3] the Secretary's authority to direct funds toward this particular target group was outlined by the 1978 CETA reauthorization which amended § 301(a) to read as follows:

> (a) The Secretary shall use funds available under this title to provide services authorized under all titles of this Act and for employment and training programs that—
>
> (1) meet the employment-related needs of persons who face particular disadvantages in specific and general labor markets or occupations including offenders, persons of limited English language proficiency, handicapped individuals, *women*, single parents, displaced homemakers, youth, older workers, individuals who lack educational credentials, public assistance recipients, and other persons whom the Secretary determines require special assistance. [Emphasis added.]

The more difficult question is whether in order more effectively to aid women as a target group, the Secretary may fund programs that are sexually exclusive in character. Neither the language nor the legislative history of CETA gives a clear indication how Congress intended that programs of this sort be funded, in contrast, for example, to those that are for practical reasons limited to the handicapped or to persons with limited English language proficiency. The limited congressional discussion in connection with the floor amendment that led to the inclusion of the reference to women in the list of disadvantaged groups now found in § 301(a) focused primarily on the low pay and high unemployment rate of women in the labor force and the need to provide women with basic resources to overcome these disadvantages.[4] In contrast to other legislation that expressly authorized Agencies to take affirmative action

---

[3]The earlier version of this provision provided in pertinent part:

The Secretary shall use funds available under this title to provide additional manpower services as authorized under Titles I and II to segments of the population that are in particular need of such services, including youth, offenders, persons of limited English-speaking ability, older workers, and other persons which the Secretary determines have particular disadvantages in the labor market. [Act of December 28, 1973, 87 Stat. 857, 891.]

[4]124 Cong. Rec. H. 10474 (Sept. 22, 1978) (Representative McGuire). *See also, id.*, H. 12444 (Oct. 11, 1978) (Conference Report) (stating without elaboration that women are to be included in the list of those facing disadvantages in the labor market).

favoring members of certain disadvantaged racial or ethnic groups to the exclusion of other persons,[5] there is no explicit statement that sexually exclusive programs were thought necessary here.[6]

Nevertheless, the apparent purpose of § 301(a) is to provide special assistance to particular groups. In accord with that purpose, the Secretary may fund programs designed for assistance to one or more of these special target groups, and limit the admittance to those for whom the programs were designed. Congress left it to the discretion of the Secretary to determine how best to provide services to the special target groups. The Secretary's exercise of this discretion in circumstances such as these will not ordinarily be disturbed as long as it is consistent with the governing statute and does not violate constitutional requirements. *See, e.g., FTC* v. *Sperry & Hutchinson Co.,* 405 U.S. 233 (1974); *FCC* v. *Schriber,* 381 U.S. 279, 289-294 (1965).

III.

The Secretary's authority is limited, however, by § 132(a) of the Act, 29 U.S.C. § 834. It is a provision modeled on Title VI of the 1964 Civil Rights Act[7] but expanded to bar additional forms of discrimination:

> No person in the United States shall on the ground of race, color, religion, sex, national origin, age, handicap, or political affiliation or belief be excluded from participation in, be denied the benefits of, be subjected to discrimination under, or be denied employment in the administration of or in connection with any program or activity funded in whole or in part with funds made available under this Act.

The intent of Congress in including this provision as part of CETA must be discerned not simply from the words of the provision but also from its relation to § 301. In title III Congress undertook to aid specified target groups, including women, persons with limited English language proficiency (a characteristic likely to correlate with national origin), older workers, and handicapped persons. In light of that intent, we do not think that Congress intended § 132(a) to serve as a statutory directive mandating at the same time the provision of such specially designed remedial opportunities on a uniform basis to all comers, male and female, persons who for whatever reason wish to enhance their proficiency in English grammar and related skills, the young and

---

[5]Compare the minority set-aside provision of § 103(f)(2) of the Public Works Employment Act of 1977, 42 U.S.C. § 6705(f)(2) and its legislative history as discussed, *e.g.,* in *Fullilove* v. *Kreps,* 584 F. (2d) 600 (2d Cir. 1978).

[6]*See* H. Rept. No. 1124, 95th Cong., 2d sess. 15 (1978); S. Rept. No. 891, 95th Cong., 2d sess. 3, 7 (1978); 124 Cong. Rec. S. 13960 (Aug. 22, 1978) (1978 version); H. Rept. No. 659, 93d Cong., 1st sess. 14, 24 (1973); H. Rept. No. 737, 93d Cong., 1st sess. 62 (1973); 119 Cong. Rec. 25702, 38409, 38417, 38419, 38422 (1973) (1973 version).

[7]The original provision, § 712 of the 1973 Comprehensive Employment and Training Act, 87 Stat. 857, read as follows:

> No person in the United States shall on the ground of race, color, national origin, or sex be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity funded in whole or in part with funds available under this Act.

274

the old, persons whether or not handicapped. Because § 132(a) is part of a statutory scheme which clearly contemplates that benefits will be directed to certain target groups, it may well be appropriate to give it different application when applied to remedial programs than would be the case where, as in *Bakke,* the Court was asked to interpret the significance of similar language standing alone. Insofar as the Court's interpretation of title VI turned in the end on constitutional analysis,[8] it is nevertheless clearly pertinent here. Even in the absence of a statutory bar to the proposed award of funds, the constitutionality of such Federal action remains to be considered.

## IV.

It now seems relatively certain that the Supreme Court has adopted an intermediate Equal-Protection analysis with regard to gender-based classifications, inquiring whether the classification serves important governmental objectives and is substantially related to the achievement of those objectives. *See, Califano* v. *Webster,* 430 U.S. 313, 316-17 (1977); *Craig* v. *Boren,* 429 U.S. 190, 197 (1976). *See also, Regents of the University of California* v. *Bakke,* 438 U.S. 265, 302, 303 (Powell, J.). While the application of this standard has not yet been fully explored in the context of affirmative action programs, certain basic points are clear.

It is first evident that achievement of a work force composed of a specified percentage of women merely because of their sex is not an acceptable governmental goal. *Bakke,* at 307 (Powell, J.). Neither will such justifications based on administrative convenience suffice to sustain a gender-based classification. *Califano* v. *Goldfarb,* 430 J.S. 199, 209-210 (1977). On the other hand, the governmental interest in "ameliorating, or eliminating where feasible, the disabling effects of identified discrimination" is "legitimate" and "substantial." *Bakke, ibid.* (Powell, J.).[9]

---

[8]The majority of the Court in *Bakke* adopted the view that, in the context of a remedial program, title VI prohibits only those racial classifications as are barred by the constitutional guarantee of equal protection. 438 U.S. 265, 286, 287 (Powell, J.); 438 U.S. 265, 327, 328 (Brennan, White, Marshall, and Blackmun, JJ.)

[9]It is, however, uncertain under the Court's earlier decisions just how specific such a finding of discrimination must be. A showing of lower prevailing wage rates justified the adjustment in number of low wage years excluded in calculating Social Security benefits that was upheld in *Califano* v. *Webster.* There the Court expressly stated that "[r]eduction of the disparity in economic conditions between men and women caused by the long history of discrimination against women has been recognized as such an important governmental objective." *Califano* v. *Webster,* 430 U.S. 313, 317 (1977). Evidence of general economic disparity reflected in wage and labor market statistics, a disparity that would in some measure be remedied by provision of preferential property tax exemptions, sufficed in *Kahn* v. *Shevin,* 416 U.S. 351 (1974). *See also, Lewis* v. *Cowen,* 443 F. Supp. 544 (E.D. Pa. 1977) (three-judge court) (provision of Railroad Retirement Act authorizing retirement with a full pension by women at age 60 but only reduced benefits for men between the ages of 60 and 65 upheld, *inter alia,* as reducing economic disparity resulting from the payment of lower wages to women). A gender-based classification was also sustained in *Schlesinger* v. *Ballard,* 419 U.S. 498 (1975), where the more beneficial treatment of women had been designed to equalize the opportunities for promotion available to male and female naval officers.

The second requirement, that the gender-based classification be ''substantially related'' to the achievement of legitimate Government objectives, is somewhat less well defined. It is clear that the justification for the classification must in fact reflect the real governmental objective; for example, reliance on an overbroad assumption about dependency will not be regarded as an effort to remedy even demonstrable need. *Califano* v. *Goldfarb, supra; Weinberger* v. *Wiesenfeld,* 420 U.S. 636 (1975).[10] Careful articulation of the intended objective is particularly important, *see, Califano* v. *Webster, supra,* so that the existence of such a direct nexus between injury and remedy will be apparent. A sound statistical or empirical base in support of the asserted assumptions is also important. *See, Craig* v. *Boren, supra.* Thus, where a gender-based classification is chosen as a means for achieving even those governmental objectives that are recognized to be legitimate, and particularly where such a classification is used to exclude certain persons from any possibility of receiving benefits or participating in Government programs because of their sex, care must be taken to provide a clear and demonstrable justification.[11]

## V

You have characterized findings by the Secretary of Labor regarding the underrepresentation of women in the skilled crafts and construction industry as evidencing ''the disabling effects of discrimination on women's participation'' in these segments of the labor market.[12] Your concern is to provide the

---

[10]The courts have similarly, but without direct reference to the ''substantial relationship'' test, held that judicially imposed remedies designed to aid the victims of past discrimination must be precisely tailored so as not to exceed the scope of the underlying injury. *See, e.g.. Chance* v. *Board of Examiners,* 534 F. (2d) 993, 999 (2d Cir. 1976), cert. denied, 431 U.S. 965 (1977) (rejecting preferential retention of female or minority employees during layoffs to the detriment of senior nonminority personnel where such victims of past discrimination have been made whole by their appointment to an appropriate job with an appropriate fictional hiring date).

[11]For example, a gender-based classification was struck down in *Meloon* v. *Helgemoe,* 564 F. (2d) 602 (1st Cir. 1977). In that case, the court relied rather heavily on New Hampshire's failure to provide a sufficient justification for adoption of such a classification, striking down a criminal statute which prohibited males from engaging in sexual intercourse with females under 15 but not like conduct by females with males under 15.

[12]You indicate that recently amended Labor Department regulations, 29 CFR Part 30, provide that written affirmative action plans for apprenticeship programs registered with the Department or with State agencies cover women, and include the establishment of goals and timetables. *See* 43 F. R. 20760 (May 12, 1978). At the time these regulations were promulgated the Department concluded that ''[i]f women are ever to be fairly represented in the skilled crafts, their entry into apprenticeship programs must be greatly accelerated.'' *Id.,* at 20762. Although women constituted 40.5 percent of the national labor force in 1976, *id.,* at 20764, the Department found that

[w]omen have had only limited participation in apprenticeship programs, which is how many skilled craftsworkers enter their jobs . . . . [T]he proportion of women carpenters, electricians, painters, plumbers, machinists, mechanics, stationary engineers, and a few other skilled trades ranged from less than 1 percent to about 3 percent of the total. Although the number of women apprentices increased by 74 percent in one year (1974-75) they still represented only 1.2 percent of the total number of apprentices registered. [Emphasis added.] [43 Fed. Reg. 20761]

The Department further found that while women were available and interested in entering the skilled trades ''the longstanding reputation of the trade for excluding women discourages many women from applying for these jobs.'' *Id.,* at 20763.

276

assistance necessary to eliminate these continuing effects of discrimination. To that end the WOW program is designed to provide participants with remedial instruction in mechanics, mathematics, and handling of tools, subjects which, during high school, women may have been prevented or discouraged from pursuing. The program seeks to provide an opportunity to review and reaffirm basic skills and knowledge in a supportive atmosphere, thereby bolstering self-confidence and commitment to a career in the skilled crafts or construction industry. At the same time it also seeks to allay uncertainty and eradicate self-fulfilling doubts regarding prospects for success in jobs which women have in the past been discouraged from seeking. We believe that these are the types of substantial and legitimate governmental objectives that would satisfy the Supreme Court's gender-based equal protection analysis.

Of greater concern is that the program satisfy the second part of the Court's requirement, *i.e.*, that there be demonstrated a substantial relationship between the choice of a gender-based classification and the achievement of the governmental objectives. While the Department, as previously noted, has already made certain findings concerning the underrepresentation of women in the construction trades, care should be taken as fully as possible to identify discrimination in the particular fields for which training is proposed. Also, women generally suffer from discrete educational deficiencies in the fields of basic mathematics, mechanics, and the manual arts. To support this generalization, an effort should be made to develop a factual record and to make findings with regard both to the existence of discrimination that has deterred women from seeking employment in the fields of construction, auto repair, and electronics, and with regard to practices of educational institutions that resulted in identifiable educational deficiencies specific to women. To the extent possible, these findings should be made both with reference to the Nation as a whole and with reference to the metropolitan Washington area.[13]

The electronics training segment of the WOW program requires special consideration because this training is somewhat different from the remedial education and support services in the other training tracks. Although such services are also provided during the first 2 months of the 14-month electronics course, the bulk of the training provided as part of the electronics segment satisfies the requirement of an additional period of formal vocational education

---

[13]Section 301 authorizes funding of programs designed to remedy disadvantages found in general as well as in specific labor markets. Congress appears to have envisioned the use of title III funds to underwrite pilot programs capable of subsequent nationwide application. It may also be argued that in light of the mobility of the population, where denial of employment or educational opportunities is alleged, the discrimination is not limited to that practiced in the immediate local area. *Cf., Gaston County* v. *United States*, 395 U.S. 285 (1969). The case in support of the WOW program and others like it may nevertheless be significantly strengthened by reference to evidence of discrimination on the local level.

While Agencies of the D.C. government or personnel affiliated with the WOW program may provide necessary data or other evidence of local discrimination, findings of fact prepared by the Department of Labor would more surely constitute the sort of administrative findings envisioned by Mr. Justice Powell in *Bakke* as a critical factor in sustaining an affirmative action program which purports to remedy past discrimination. *See* 438 U.S. at 307-310.

that is regarded by employers in this field as a prerequisite before an applicant is considered eligible for employment.

In a number of cases the use of judicially imposed quotas or racially exclusive apprenticeship programs has been upheld by the courts.[14] Those programs were designed to correct inequities in the actual operation of existing training programs by providing instruction tailored to minority needs or were intended to create a parallel educational opportunity where entry into the existing training structure has been effectively closed to members of minority groups. The additional formal training which the WOW electronics program represents is justified in terms of a discriminatory denial of pertinent post-secondary level opportunities for necessary vocational education. The findings of the Department of Labor demonstrate the exclusion of women from apprenticeships in the skilled crafts generally and suggest that women have been discriminated against in training programs such as this one. However, the electronics program does more than provide necessary supplemental training designed to make up for denial of pertinent high school level educational opportunities and goes beyond facilitating the entry into the job market of eligible persons with requisite qualifications. Therefore, specific findings—which link the need for provision of advanced training either directly to discriminatory practices in existing training programs or more indirectly to limited participation training opportunities that have resulted from practices and perceptions of practices in the job market—are important to support this particular segment of the WOW program.

## VI.

The development of a detailed administrative record will aid significantly to sustain the legality of the WOW program in the event it is judicially challenged. We believe, however, that because the racially exclusive nature of the Davis admissions program proved to be perhaps the most significant factor in the *Bakke* decision, you should carefully consider whether a continuation of the program's sexually exclusive approach is advisable.[15]

---

[14]*See, e.g., Southern Illinois Builders Ass'n* v. *Ogilvie*, 471 F. (2d) 680 (7th Cir. 1972); *United States* v. *Ironworkers Local 86*, 443 F. (2d) 544 (9th Cir. 1971), cert. denied, 404 U.S. 984 (1971); *Buckner* v. *Goodyear Tire & Rubber Co.*, 339 F. Supp. 1108 (N.D. Ala. 1972), *aff'd*, 476 F. (2d) 1287 (5th Cir. 1973). *But see, Weber* v. *Kaiser Aluminum & Chemical Corp.*, 563 F. (2d) 216 (5th Cir. 1977), 443 U.S. 193 (1979).

[15]Particular care should be taken to justify the choice of a racially or sexually exclusive approach undertaken by an Agency in the absence of an explicit congressional determination and directive that this sort of a remedial affirmative action program is necessary in light of the inadequacy of other alternative approaches. The utilization of a program designed along exclusive lines is justified where undertaken pursuant to express congressional authorization. The adoption of a sexually exclusive program such as WOW which is undertaken pursuant to CETA presents what appears to be a middle case. While it may be inferred from the underlying congressional authorization that such a program would be consistent with the statutory scheme, an explicit congressional directive that programs drawn along these lines be employed is lacking. We therefore believe that the Department should consider and specify the reasons why it believes that the adoption of a sexually exclusive approach to the administration of the WOW program is warranted.

Certain cases suggest that the use of an adequately justified gender-based classification providing a remedial preference solely for women will be upheld. *See, Califano* v. *Webster, supra; Kahn* v. *Shevin, supra; Schlesinger* v. *Ballard, supra.* It is not clear, however, what effect the *Bakke* decision has had in this area. The four justices in the Brennan group applied the standard applicable to classifications based on sex and upheld the program.

Moreover, we believe that this program can be distinguished from the one struck down by the Court in *Bakke.* First, the authorization to fund a sexually exclusive program can be inferred from a statute that explicitly directs the Secretary to use Federal funds to provide services, employment, and training programs for women. Second, if appropriate findings, as outlined above, are made, they will establish a factual predicate of past discrimination closely related to the aims of the remedial program. Third, the nature of the exclusion here is significantly different from that present in the program held to be unlawful in *Bakke.* It is harder to identify the practical harm to the men who are excluded from this program since the program has been newly established in order to expand the pool of qualified job applicants by providing training to a class that has suffered discrimination in the past. Men can continue to enter the trade through the same apprenticeship programs that they have used in the past.

Nevertheless, the law in this area is far from clear and risks exist in funding a sexually exclusive program. Critical to Mr. Justice Powell's pivotal opinion is the view that for a racially exclusive classification to be sustained, some significant justification for a departure from the norm of equal access for all and distribution of benefits according to individual merit or need must be provided. Such a justification may also be required where a sexually exclusive classification is employed, albeit that it may be subjected to a less stringent standard than that applicable under *Bakke,* where racial classifications are utilized. In either event, where the aims of a program can be effectively accomplished without the adoption of an exclusive classification the exclusivity might be seen as insufficiently justified.

To our knowledge, no attempt has been made formally to justify the decision to administer the WOW program along sexually exclusive lines. One possible argument in favor of this approach is that it serves more efficiently to funnel benefits to those presumed by the statute to need them most. In most circumstances, however, administrative convenience alone has not proved to be an adequate governmental interest to sustain gender-based classifications.[16]

Alternatively, while it is doubtful that a sexually exclusive training program could properly be maintained, in this case, since counseling is an integral and inseparable aspect of the WOW training process, the exclusion of men from the counseling or training sessions appreciably increases the program's efficacy in breaking down participants' self-doubts and stereotyped visions of themselves. It might, moreover, be shown that because of past discrimination and their limited access to training in the industrial and manual arts and related subjects,

---

[16]*See, e.g., Califano* v. *Goldfarb, supra,* at 217.

279

women suffer from particularly severe and distinctive deficiencies in skill and knowledge relating to mechanics and tools so as to justify channeling available funds to their sole benefit. Broad assumptions or assertions based upon outmoded stereotypes alone, may not, in any event, serve as adequate justification for adoption of gender-based classifications, and selection criteria could better be structured to include women rather than outright prohibiting men from participation in the program.[17]

We recommend that based on the sort of findings described above, a rebuttable presumption be adopted that women who meet the program's eligibility requirements, more than others, have suffered from discrimination and its lingering effects. However, the applications of males who might also have been victims of similar discrimination in the job market or who, in their educational careers, have likewise been discouraged from developing basic mechanical and manual skills, should likewise be considered.

The program still could continue to focus primarily on women. For instance, we see no reason why the program's name needs to be changed. Nor do we see any legal reason why those who administer the program cannot openly take steps designed to attract female applicants. Our advice is that, in light of *Bakke*, you should carefully consider reasonable alternatives that are not sexually exclusive and which would effectively accomplish the goals of the program. The objectives of the WOW program, as we understand them, are certainly important governmental interests. We do not here discourage in any way the achievement of those objectives.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[17]*Id.*